**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MILFORD CHRISTIAN CHURCH; et al. | : | |
| | : | DKT No.: 3:23-cv-00304 (MPS) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CHARLENE M. RUSSELL-TUCKER, | : | |
| in her official capacity only, et al. | : | |
| | : | |
| Defendants. | : | March 9, 2023 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY
MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

The Plaintiffs – Milford Christian Church, Pastor James Loomer, Janet Parady, and Jessica Cavarretta – are simple people of faith who just desire to obey God and serve their community in peace as they have done for more than 30 years. In service to their community, Milford Christian Church (MCC), Pastor Loomer, and Ms. Parady have operated educational ministries under the umbrella of MCC for the past 25 to 30 years. The Defendants, however, have presented them with a sinister, three-headed ultimatum that forces them to choose between (1) requiring their students to be vaccinated in direct disobedience to the tenets of their faith, (2) expelling their unvaccinated students in violation of Jesus' command to love all men, (3) or face the state closure of an essential ministry that Milford Christian Church has conducted for many years.

None of these choices are acceptable or an option for MCC, Pastor Loomer, and Ms. Parady as each would violate their religious convictions. Additionally, the choices would leave Jessica Cavarretta without a place to educate her son in accordance with her faith.

After prayerful consideration, the Plaintiffs have turned to this Court for emergency injunctive relief. They respectfully ask the Court to immediately issue a temporary restraining order prohibiting the Defendants from coercing them into an unconscionable choice by their deadline of March 15, 2023 and a preliminary injunction that would protect their rights to religious freedom while the Court conducts a thorough consideration and determination of their case.

## **FACTUAL BACKGROUND**

### I.    **Conn. Gen. Stat. § 10-204a:**

On April 27, 2021, the Connecticut General Assembly passed Public Act No. 21-6 and immediately sent it to Governor Ned Lamont for his signature. [1] Dkt. 1, ¶ 11. Governor Lamont signed it, and it took effect immediately. *Id.* at ¶ 11.

The act, now codified at Conn. Gen. Stat. § 10-204a, amended the previous version of Conn. Gen. Stat. § 10-204a, which imposed a vaccination requirement as a prerequisite for daycare, preschool, and school attendance in Connecticut, but allowed for religious and medical exemptions. *Id.* at ¶ 12. The act eliminated the religious exemption to the vaccination requirement. *Id.* at ¶ 12.

The practical effect of the amendment was to require parents of children enrolled in preschool or any other prekindergarten programs – public or private – to vaccinate their children on or before September 1, 2022 or not later than fourteen days after transferring to another program and to submit proof of that vaccination to their school even if vaccinating their children is contrary to their religious beliefs. *Id.* at ¶ 13; *see also* Conn. Gen. Stat. § 10-204a(a).

---

[1] The Plaintiffs support their emergency motion by way of their sworn and verified complaint. *See* Dkt. 1.

Public Act No. 21-6, however, contained what is colloquially referred to as a "grandfathering" provision. *Id*. at ¶ 14. The "grandfathering" provision permits parents of children enrolled in kindergarten through grade 12 prior to April 28, 2021 to vaccinate their children if vaccinating their children is contrary to their religious beliefs and they has already claimed a religious exemption with their school or kindergarten. *Id*. at ¶ 14; Conn. Gen. Stat. § 10-204a(b).

Finally, Public Act No. 21-6 preserved secular exemptions from the vaccination requirement in the form of medical exemptions upon the provision of a medical professional's note. *Id*. at ¶ 15; *see also* Conn. Gen. Stat. § 10-204a(a).

Public Act No. 21-6 became the immediate subject of litigation before this Court. *See We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 579 F.Supp.3d 290 (Jan. 11, 2022) (Arterton, J.) (dismissing claims for failure to state a claim upon which relief could be granted). The *We The Patriots USA, Inc.* case remains pending a decision by the Second Circuit in the docket number 22-249.

## II.    Context Of Vaccines:

Vaccines typically consist of a virus (or a component of a virus), a liquid buffer, contaminants from the cell line used to manufacture it, commercial stabilizer, and other additives. Dkt. 1, ¶ 16. Notably, it is physically impossible to remove all cell line contaminants from a vaccine dosage. *Id*. at ¶ 17.

It is well-established that pharmaceutical companies used cell lines artificially developed from aborted fetuses to research, develop, test, and produce vaccines. *Id*. at ¶ 18. Thus, as of February 2020, the United States Center for Disease Control and Prevention (CDC) lists ten manufactured vaccines that contain or were developed and

tested using cell lines artificially developed from aborted human fetal cells. *Id*. at ¶ 19; *see also* Dkt. 2.

The presence of very small amounts of human fetal cells and DNA in the human blood – the kind produced when a person is injected with a vaccine – can create a very strong autoimmune reaction in a person by which their own body turns against itself and starts killing its own cells and tissues. Dkt. 1, ¶ 20.

## III.    Milford Christian Church

Milford Christian Church (MCC) is a nonprofit religious organization organized and incorporated under Connecticut law. *Id*. at ¶ 2. It operates a church in Milford, Connecticut and has approximately 50 members. *Id*. at ¶¶ 21-22. In addition to conducting traditional church services, Milford Christian Church operates various ministries focused toward the spiritual needs of its community, including but not limited to holding prayer vigils and witnessing outside of Connecticut abortion clinics, a kids church, a pre-kindergarten daycare and preschool known as Little Eagles, and the Milford Christian Academy – a school that provides grades K-12 education. *Id*. at ¶ 23.

MCC's foundational principle that animates each of its ministries is to provide its members with spiritual education and edification in a world that has lost touch with God. *Id*. at ¶ 24. In particular, its educational ministries employ "The Principal Approach" – a rigorously Biblical and practical view of life and education in which God is the center of attention and informs both education and worldview. *Id*. at ¶ 24.

Its educational ministries start right from daycare and preschool activities. *Id*. at ¶ 26. Through its daycare and preschool, Little Eagles, MCC helps children learn about themselves and their world through a biblical lens, learn appropriate communication and

social skills with respect for Christ's teachings, and develop a strong Christian character premised on self-confidence and self-discipline. *Id*. at ¶ 26. Once a student is ready to enter formal education in the grades K-12, MCC offers a continued ministry to both their education and souls through Milford Christian Academy. *Id*. at ¶ 27. From a practical perspective, MCC's approach has been extremely successful with approximately 95 percent of Milford Christian Academy's graduates being accepted to college. *Id*. at ¶ 28.

Two of MCC's fundamental principles and teachings of faith are relevant to this case. First, MCC teaches the sanctity of all life, and it holds as a doctrinal tenet of faith that life begins at the moment of conception. *Id*. at ¶ 31. Thus, it holds and teaches that the abortion of an unborn fetus is the intentional, premeditated murder of an innocent and pure life. *Id*. at ¶ 31.

Second, MCC relies on St. Paul's first epistle to the Corinthians, chapter 6, verses 19-20 to teach that Christians' bodies are the temples of the Holy Spirit and that they have a responsibility to keep their bodies pure and holy before God. *Id*. at ¶ 32. In particular, this teaching prohibits MCC members from consuming products that might cause them or their children physical harm. *Id*. at ¶ 32.

In practice with respect to the issue of vaccines, MCC relies on St. Paul's first letter to Timothy, chapter 5, verse 22 to teach that its members should not take part in other people's sin by consuming vaccines manufactured, tested, or otherwise developed using cell lines artificially developed from murdered unborn babies. *Id*. at ¶ 33. Additionally, MCC instructs its members that they should weigh within their own consciences whether vaccines would defile their bodies in the spiritual sense before God. *Id*. at ¶ 34.

Consistent with these teachings and tenets of faith, MCC has long declined to enforce a vaccination requirement on its students and their parents. *Id*. at ¶ 35.

## IV.    Pastor James Loomer & Janet Parady:

Affectionately known to his flock as "Pastor Jim," Pastor James Loomer has served as the senior pastor of MCC for over 32 years. *Id*. at ¶ 42. During his service as senior pastor, he has expanded MCC's ministries to include educational ministries, including Little Eagles and Milford Christian Academy. *Id*. at ¶ 43. Pastor Loomer's responsibilities as senior pastor include establishing MCC's doctrine and teachings and ensuring that they are followed throughout its ministries. *Id*. at ¶ 44. Thus, he has established MCC's doctrinal tenets of faith pertaining to the sanctity of life, abortion, the holiness of the Christian body, and vaccines. *Id*. at ¶¶ 44-48.

Likewise, Janet Parady – affectionately known to parents and students alike as "Miss Janet" – operates and manages Little Eagles' Daycare and Preschool for MCC. *Id*. at ¶ 4. As someone entrusted with ministry for MCC, she is required to, and does, profess, believe, and apply MCC's teachings pertaining to the sanctity of life, abortion, the holiness of the Christian body, and vaccines personally and within the ministry with which MCC has entrusted her with. *Id*. at ¶ 49.

## V.    Jessica Cavarretta:

Jessica Cavarretta is a mother whose three-year-old son attends Little Eagles pre-school and daycare. *Id*. at ¶ 53. She holds the sincere religious belief that to use or benefit from the use of cell lines artificially developed from an aborted fetus is morally and spiritually wrong. *Id*. at ¶ 55. She also holds the since religious belief that injecting her son with a vaccine would pollute his body as the temple of the Holy Spirit. *Id*. at ¶ 56.

Based on these religious beliefs, Cavarretta has not vaccinated her older child who has been allowed to keep their religious exemption under Connecticut's "grandfathering" provision. *Id*. at ¶ 54. She maintains the same attitude toward vaccinating her three-year-old son. *Id*. at ¶ 57.

## VI.    The Defendants' Ultimatum:

On or about Wednesday, March 1, 2023, Inspector Bridget Merrill from the Connecticut Office of Early Childhood conducted an annual inspection of Little Eagles – MCC's daycare and preschool ministry. *Id*. at ¶ 37. She cited MCC for honoring certain students' religious objections to vaccines, including the flu vaccination, and ordered MCC to submit a corrective action plan by March 15, 2023 to bring its students up to date on their vaccinations. *Id*. at ¶ 38.

When MCC personnel pressed her about MCC's options and their doctrinal teachings, Inspector Merrill delivered a three-headed ultimatum to MCC: (1) Submit a corrective action plan outlining a catch-up schedule for the children's vaccinations; (2) expel the non-vaccinated children; or (3) the OEC would close Little Eagles. *Id*. at ¶ 39.

As the Plaintiffs see the ultimatum, it roughly translates into the following unconscionable choices: "(1) Abandon your deeply held religious beliefs to obey the state; (2) violate the biblical command given by Christ himself in the Gospel of Mark, chapter 12, verse 31 to love your neighbor as yourself; or (3) face the closure of an essential ministry that Milford Christian Church has conducted for many years." *Id*. at ¶ 40.

All of these options would require MCC to violate its fundamental professions of faith. *Id*. at ¶ 41.

## LEGAL STANDARD

To obtain a preliminary injunction under Fed. R. Civ. P. 65, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks and citation omitted). Additionally, the moving party must show "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted).

Districts courts within the Second Circuit apply the same legal standard governing preliminary injunctions to temporary restraining orders. *See Lazor v. University of Connecticut*, 560 F.Supp.3d 674, 677 (D. Conn. 2021). They, however, bear in mind that the purpose of a temporary restraining order is "to preserve an existing situation *in status quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Baltas v. Maiga*, 2020 WL 6275224, at *20 (D. Conn. 2020) (Shea, J.) (quoting *Garcia v. Yonkers School Dist.*, 561 F.3d 97, 107 (2d Cir. 2009)) (internal quotation marks and citations omitted).

## ARGUMENT

**I.    The Plaintiffs Are Entitled To A Presumption Of Irreparable Harm At This Stage And There Is Good Cause To Expedite Consideration Of Their Emergency Motion For A Temporary Restraining Order And A Preliminary Injunction.**

It is well-established within the Second Circuit that a showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction…"

or a temporary restraining order. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). To satisfy the irreparable harm requirement, the Plaintiffs "must demonstrate that absent a preliminary injunction [or temporary restraining order] they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. at 118 (internal quotation marks and citations omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id*. at 118-19. Court, however, will presume that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

There is no question that the Plaintiffs are entitled to the presumption of irreparable harm. They claim constitutional rights to freely exercise their religion, freely engage in speech, freely associate with each other, direct the rearing of their children, and to be treated equally under the law and that Conn. Gen. Stat. § 10-204a and the Defendants' conduct seek to deprive them of those rights. *See* Dkt. 1, ¶¶ 58-84. The Supreme Court has found each of these rights to be fundamental within our system of ordered liberty. *See Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-313 (1976); *William v. Rhodes*, 393 U.S. 23, 30-34 (1968). Thus, the Plaintiffs urge the Court to find that they are entitled to a presumption of irreparable harm in this matter.

The Plaintiffs also demonstrate actual irreparable harm too. This case goes far beyond the simple closure of a daycare and preschool. It strikes right to the heart of the

Plaintiffs' right to practice their religious beliefs free from state interference, freely express those religious beliefs, associate with each other for the purpose of practicing their religious beliefs, and to direct the spiritual and practice rearing of their children. If they are deprived of the right to freely engage in those activities for a single second by virtue of the Defendants closing their educational ministries, monetary damages – even if they were available in light of the labyrinth of immunity doctrines that would frustrate such claims – would never be able to compensate the Plaintiffs for the time in which their government prevented them from freely honoring and obeying God. Thus, the Plaintiffs urge the Court to find that the Defendants' conduct poses the very likely risk of an actual and imminent injury to the Plaintiffs.

Finally, there is good cause for the Court to act upon the Plaintiffs' request for emergency injunctive relief in the form of a temporary restraining order and a preliminary injunction immediately. The Plaintiffs were given a mere two weeks to submit to the Defendants' demands or face the closure of their educational ministries by March 15, 2023. They acted diligently to locate and inform counsel of their plight, and counsel has acted with speed to place this matter in front of the Court. The impending deadline of March 15, 2023 leaves the Plaintiffs and the Court with little to no time to conduct a thorough hearing on the merits of the Plaintiffs' claims prior to the Defendants' conduct injuring the Plaintiffs. Further adding to this concern is that the Plaintiffs have precious little time to appeal an adverse ruling from the Court. Thus, they submit to the Court that the emergency issuance of a temporary restraining order will preserve the status quo of this case until the Court has the opportunity to obtain careful briefing from the parties and thoughtfully consider the merits of the Plaintiffs' claims.

**II.    The Plaintiffs Demonstrate A Likelihood Of Success On The Merits Of Their Claims Or Sufficiently Serious Questions Going To The Merits That Make Them A Fair Ground For Litigation.**

    **A.  The Plaintiffs demonstrate a likelihood of success on their Free Exercise Clause Claim.**

As prior litigation has shown, the Plaintiffs' Free Exercise Clause claim demands a painstaking analysis due to the legal and factual issues that the Court must consider. Thus, to the extent that the Plaintiffs can in the space available to them, they submit that Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, and the Defendants' application of it are subject to strict scrutiny for three reasons. First, Conn. Gen. Stat. § 10-204a fails the "neutrality" and "general applicability" test established in *Employment Div. Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). Second, Conn. Gen. Stat. § 10-204a presents a hybrid-rights situation under *Smith*. Third, *Smith*'s "neutrality" and "general applicability test deviates from the text and history of the First Amendment.

The Plaintiffs further submit that Conn. Gen. Stat. § 10-204a and the Defendants' application of it to them cannot survive strict scrutiny.

    **1.  Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, fails *Smith*'s "neutrality" and "general applicability" test.**

At the outset, a law will not qualify as neutral if a religious exercise is the "object" of a law and not just "incidental[ly]" or unintentionally affected by it. *Smith*, 494 U.S. at 878. At a bare minimum, that means that a law may not "discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). It also means that a law will not qualify as neutral if it is "specifically directed at… [a] religious practice." *Smith*, 494 U.S. at 878.

Prior to April 28, 2021, Conn. Gen. Stat. § 10-204a imposed a vaccination requirement as a prerequisite for children to attend Connecticut schools, but it permitted parents to claim religious and medical exemptions to the requirement. Dkt. 1, ¶ 12. Through Public Act 21-6 though, Connecticut specifically targeted religious practices that it disagreed with – refusing to take a vaccine because of its ingredients – and it eliminated any tolerance for those religious beliefs by completely foreclosing any and all avenues for parents who hold religious beliefs against taking vaccines to educate their children at all. The method by which it accomplished this? Public Act 21-6 amended Conn. Gen. Stat. § 10-204a to prohibit public, private, and, in the Defendants' interpretation, religious schools, daycares, and preschools from accepting students whose parents refuse to vaccinate them in violation of their religious convictions. It, however, left untouched public, private, and religious schools' ability to accept students claiming medical exemptions from the state's vaccination requirement.

Thus, even if Public Act 21-6's legislative history is free from expressions of animus, what it did speaks louder than any legislative pontifications. The message that it sends is loud and clear: Your children will not be educated if you do not subjugate your religious beliefs to the dictates of the state. Thus, in no way is Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, neutral.

Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, also fails *Smith*'s "general applicability" test. "A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1877 (2021) (internal quotation marks and citations omitted). "A law also lacks general

applicability if it permits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 1877. While it is true that all laws are somewhat selective, the Supreme Court has held that specific "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Hialeah*, 508 U.S. at 542.

With respect to the lack of general applicability as a categorical matter, at least one circuit court has previously held that the categorical granting of medical exemptions, but not religious exemptions, violates the neutrality and general applicability requirements of the Free Exercise Clause. *See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999). In *Newark*, the Third Circuit held that a police department's medical exemptions from a shaving policy, but categorical denial of religious exemptions, constituted a set of individualized exemptions within the meaning of *Lukumi*. Of particular concern to the Third Circuit was when "the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection, but not for individuals with a religious objection." *Id*. at 365. Thus, it held that such a categorical distinction triggered strict scrutiny because the medical exemption undermined the government's interests in the same way that the religious exemption did. *Id*.

Concededly, the Second Circuit disagreed with the Third Circuit's view in *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 285 (2d Cir. 2021), specifically citing *Smith*'s finding that the criminalization of substance possession was generally applicable even though it contained an exception for medical purposes, but not religious ones.[2] *Hochul*'s

---

[2] *Hochul*'s context, however, matters – a fact that the Second Circuit itself noted when it cautioned lower courts not to assign too much weight to its opinion as it was only an opinion as to the likelihood of success

exigencies, however, distracted the Second Circuit from *Hialeah*'s cautionary note: "All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Hialeah*, 508 U.S. at 542. While *Hialeah* did not undertake to elaborate on the precise standard under which to evaluate whether a categorical prohibition fails the "general applicability" standard, it clearly held that impermissible "inequality when a legislature decides that the governmental interests that it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id*. at 542-43.

Here, Connecticut has specifically acted against conduct with a religious motivation by amending Conn. Gen. Stat. § 10-204a to extend its mandate to religious conduct. It took that specific action a step further by crafting a law that would ensure the exclusion of the faithful from every possible form of education – all while scrupulously permitting a separate secular category of conduct that undermines its interests equally to stand untouched. The Defendants then took the law a step further by applying it to a church's educational ministries, literally leaving the faithful with no sanctuary for their beliefs and no way to educate their children. This raises the very concern that *Hialeah* cautioned against, and it deprives Conn. Gen. Stat. § 10-204a of any vestige of "general applicability."

---

on the merits of the Plaintiffs' claims, not a definitive determination. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 368, 371 (2021). *Hochul* concerned an emergency Free Exercise challenge brought by New York nurses to a New York state emergency rule requiring all healthcare workers to be vaccinated against COVID-19. *Hochul I*, 17 F.4th at 274-76. Thus, the Second Circuit found that, in the context of a preliminary injunction application, the exigencies of the pandemic, the context of the regulation for healthcare workers, and the limited evidence suggested that the number of medical exemptions was not as harmful to the state's objective as the number of religious exemptions. *Id*. at 285.

The Second Circuit has since held that the question of "general applicability" is one that is fact-intensive that it requires a final merits inquiry into the government's purpose for a law and who a law applies to. *See M.A. on behalf of H.R. v. Rockland County Dept. of Health*, 53 F.4th 29, 38-39 (2d Cir. 2022).

Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, also fails a "general applicability" analysis because it creates a system of individualized exemptions that are guided by categorical "haves" and "have-nots." The medical exemptions that it permits must still be vetted and approved by state and local officials before they are granted. In other words, state and local officials still possess individualized discretion under Conn. Gen. Stat. § 10-204a to grant or deny individualized exemptions from its vaccination mandate.

Under an individualized exemption scheme, whether two activities or exemptions are comparable for purposes of a Free Exercise Clause analysis is determined by the risks that they pose, not the reasons for giving them. *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021). When two unvaccinated children walk through the schoolhouse door, disease will not walk up to them and ask them why they are not unvaccinated before it infects them. In the Defendants' eyes, both unvaccinated children – regardless of whether they are unvaccinated for medical or religious reasons – are more likely to spread contagious disease than their vaccinated peers. The Defendants, however, conduct individualized assessments of how to give exemptions with pre-ordained discriminatory outcomes that have no basis in science or law. Their individualized assessments – outcome predestined or not – render it impossible for Conn. Gen. Stat. § 10-204a to survive a "general applicability" analysis.

Additionally, Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, fails a "generally applicability" analysis because its "grandfathering" provision renders it substantially underinclusive. *Central Rabbinical Congress of U.S. & Canada v. New York Dept. of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). The "grandfathering"

provision permits thousands of students enrolled in Connecticut schools in the grades K-12 with religious exemptions prior to April 28, 2021 to complete years of education while the Defendants honor their religious beliefs. Thus, the state is not only distinguishing between religious and secular conduct that undermines its interest in a school vaccination mandate. It is also distinguishing between identical religious conduct that undermines its interest in a school vaccination mandate simply on the basis of when that religious conduct is claimed. This arbitrary distinction between identical religious conduct based on when it is claimed deprives Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, of its "general applicability."

Thus, Supreme Court precedents require the application of strict scrutiny.

### 2. Conn. Gen. Stat. § 10-204a presents a hybrid-rights situation under *Smith*.

Candor requires the undersigned to inform the Court that the Second Circuit has already rejected a hybrid-rights theory for Free Exercise Clause claims that requires the application of strict scrutiny. *See Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003). The Plaintiffs, however, still present the argument to the Court to preserve it for appellate review and because the Second Circuit's *Harrington* decision was erroneous in light of *Smith*'s reservation of a hybrid rights exception.

In justifying its decision to adopt the "neutral" and "generally applicable" standard as a prerequisite to scrutiny selection, *Smith* explored the Supreme Court's precedents at length and concluded that the only decisions in which it held that "a neutrally, generally applicable law" unconstitutional on Free Exercise grounds were cases where Free Exercise claims were co-joined with "other constitutional protections, such as freedom of speech and of the press…." *Smith*, 494 U.S. at 881-82. It then cited a litany of cases in

16

which it had invalidated laws under strict scrutiny or its equivalent to support the proposition that *Smith* was not overruling them. *Id*. at 881-82 (compiling cases).

In particular, *Smith* pointed to *Wisconsin v. Yoder*, 406 U.S. 205, 233-34 (1972) where it expressly recognized a form of heightened scrutiny for Free Exercise claims accompanied by other constitutional claims:

> *Yoder* said that "the Court's holding in *Pierce* stands as a charter of the right of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment."

*Id*. at 881 n.1. In other words, *Smith* reserves *Yoder*'s application of heightened scrutiny for hybrid rights claims.

*Leebaert*'s attempt to distinguish *Yoder* places this Court in a precarious situation. *Leebaert* held that *Yoder* explicitly limited its holding to a "free exercise claim of the nature revealed by this record." *Leebaert*, 332 F.3d at 145 (quoting *Yoder*, 406 U.S. at 233). This strained interpretation ignores *Smith*'s natural interpretation and places the Court in the awkward position of affording special treatment to a particular religious sect, which would raise substantial Establishment Clause, Free Exercise Clause, equal protection, and due process concerns.

The natural reading of *Yoder* is the one implied by *Smith*. The traditional Amish plaintiffs in *Yoder* created a compelling record for why Wisconsin's compulsory school attendance law would change their traditional way of life, which was deeply rooted in their sincere religious beliefs. *Yoder* respectfully recognized the persuasiveness of the impressive record that they had assembled as to the sincerity of their faith, commenting that few religious sects could have assembled such a record. Contrary to *Leebaert*'s

interpretation, however, it uttered no language that purported to limit the hybrid rights standard to religious sects that could assembly equally impressive records as to the sincerity of their religious beliefs.

To limit *Yoder* to similar records as the *Yoder* record would be tantamount to the Court saying that it does not believe that anyone could be as sincere in their religious beliefs as the Amish plaintiffs in *Yoder* were. In other words, *Leebaert* interprets *Yoder* as a special exception for plaintiffs who can show institutionalized religious traditions spanning centuries while denying the same first Amendment protection to plaintiffs who are equally sincere in their religious beliefs but lack centuries-old institutionalized religious traditions.

Such an interpretation is inconsistent with the Supreme Court's Establishment Clause precedents and creates disparate treatment under the law. In *United States v. Seeger*, 380 U.S. 163, 184 (1965), the Supreme Court established an objective test for the sincerity of a person's religious beliefs: "[D]oes the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?" The Supreme Court also clearly established that this test was individualistic in nature:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.

*Everson v. Board of Education*, 330 U.S. 1, 15 (1947).

Interpreting *Yoder* as being confined to cases with a similarly impressive record to the one assembled by the traditional Amish would be inconsistent with these precedents.

*Smith* clearly does not confine *Yoder* to its facts, and it clearly indicates that it did not overrule *Yoder*'s hybrid-rights selection of heightened scrutiny. *Leebaert*'s leap to do so contradicts both *Smith* and *Yoder*.

The Court should avoid committing the same error here. The Plaintiffs have asserted claims that Conn. Gen. Stat. § 10-204a violates their right to freely exercise their religion and their right to direct the education and rearing of their children – *see Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). The combination of those claims is sufficient to trigger strict scrutiny under *Yoder* and *Smith*.

### 3. *Smith*'s "neutrality" and "general applicability" test is inconsistent with the text and history of the First Amendment.

Once again, candor requires the undersigned to inform the Court that the Supreme Court has not yet overruled *Smith*, recently passing on the chance to do so in *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021) despite granting certiorari to consider that question. Thus, the Plaintiffs recognize that the Court must adhere to Supreme Court precedent, but they preserve their argument for appeal.

Compelling constitutional reasons exist to return the Free Exercise Clause to its original meaning. *Smith* erred by not relying on the text, history, or tradition of the Free Exercise Clause, but rather on several predictions about the outcome of the rule that it fashioned out of thin air. The predictions included speculation that a multitude of religious exemptions would court anarchy – *Smith*, 494 U.S. at 888 – and that state legislatures would be sufficiently "solicitous" of the need for religious exemptions. *Id*. at 890.

These alternating predictions have proven woefully inaccurate. First, RFRA has eliminated *Smith*'s federal impact for the past 28 years, and RLUIPA has also contributed to *Smith*'s negligible federal impact for the past 20 years. The Supreme Court itself

recognized that the federal judiciary is "up to the task" of determining when laws should trump free exercise rights. *See*, *e.g. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006); *see also* Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353 (2018) (assessing the number of federal RFRA and RLUIPA cases as comprising a relatively small portion of the federal caseload). In other words, *Smith*'s predictions of anarchy have proven to be unfounded. This case is unequally unlikely to yield mobs of religious fanatics running amok in Bushnell Park.

Second legislatures have proven incredibly unsolicitous of religious rights. This case is Exhibit A, but the Court need not confine itself just to this case. In the 30 years since *Smith*, the Supreme Court has confronted case after case that has imposed hostile restrictions on religious freedom. *See, e.g., Fulton*, 141 S.Ct. 1868; *Masterpiece Cake, Ltd. V. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719 (2018); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017); *Holt v. Hobbs*, 574 U.S. 352 (2015); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). In other words, legislatures and governments have been anything but solicitous of religious freedoms.

The result is that *Smith* has reduced the First Amendment's Free Exercise Clause to a watered down Equal Protection Clause that falls far short of safeguarding the affirmative right for believers to *practice* their religion free from government interference. The Founders envisioned strong affirmative protections for religious liberty when crafting the First Amendment, not an equal protection regime. *See* Michael W. McConnell, *The Origins and Historical Understanding Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1471-72  & n.320 (1990) (describing the effect of William Penn's hat and its effect on the

debate over the First Amendment). The First Amendment's text clearly indicates the Founders' vision.

The Free Exercise Clause bars states from making any law "prohibiting the free exercise of religion." Interpreted according to its "normal and ordinary… meaning" per *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Free Exercise Clause prohibits laws "forbidding or hindering unrestrained religious practices or worship." *Fulton*, 141 S.Ct. at 1896 (Alito, J., concurring) (sourcing the original "normal and ordinary" meaning of the Free Exercise Clause's text). This language grants those who wish to engage in the "exercise of religion" the right to do so without hindrance, and it does not condition that right on the treatment of others who are not exercising religion like *Smith* claims that it does.

Congress's intent to create an affirmative guarantee instead of a prohibition on non-discrimination becomes clear when considering constitutional language that does contain non-discrimination language. For instance, Art. I. § 9, cl. 6, provides that "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." In other words, had Congress desired to create a *Smith*-style Free Exercise Clause, it had clear textual examples to model the Free Exercise Clause on. It deliberately chose no to adopt *Smith*'s non-discrimination approach.

Thus, the Free Exercise Clause requires the application of the standard that *Smith* replaced in this case: A law imposing a substantial burden on religious exercise can only survive scrutiny if it is narrowly tailored to serve a compelling government interest. *See Sherbert v. Verner*, 374 U.S. 398 (1963).

21

### 4. Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, and the Defendants' conduct cannot survive strict scrutiny.

Under a strict scrutiny analysis, the Defendants must show that the challenged law is narrowly tailored to further a compelling government interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015). The Defendants cannot meet the narrow tailoring element.[3]

Conn. Gen. Stat. § 10-204a and the Defendants' interpretation and application of it is anything but narrowly tailored. It prohibits a child from attending public or private schools, daycares, and pre-schools unless that child receives the vaccinations required by the state of Connecticut. The Defendants have interpreted and applied Conn. Gen. Stat. § 10-204a to apply to religious schools and daycares such as the Plaintiffs' educational ministries. As this case shows, parents must either bring their children into compliance despite their religious beliefs or even religious educational ministries will be forced to expel their unvaccinated students or face the forced closure of their educational ministries by the Defendants. Dkt. 1, ¶¶ 39-40.

The sheer harshness of how far the Defendants have gone here cannot be overstated, and they had many ways by which they could have more narrowly tailored their "solution." The Defendants articulated a concern that parents were exploiting religious exemptions for improper purposes. They could have easily redressed that concern by reforming the religious exemption process to require parents to complete sworn statements explaining their religious beliefs and requiring a presentation on the importance of taking vaccinations and common misconceptions about them. They could

---

[3] The Plaintiffs do not dispute that the Defendants have a compelling interest in preventing the spread of contagious diseases among school children.

have permitted the Plaintiffs and similarly situated parents the ability to send their children to private religious schools, pre-schools, and daycares without forcing them to choose between their faith and their children's futures, thus mitigating a substantial portion of the problem that the Defendants perceive in public schools.

If the Defendants' concern is that too many exemptions to vaccination requirements pose a danger to public health, they could have articulated a threshold percentage of vaccinated students needed to achieve herd immunity and divided exemptions to the vaccination requirement in a non-discriminatory manner between medical and religious objectors. They chose not to do that.

Instead of selecting these reasonable alternatives, which would have struck a middle grounds, the Defendants have made it impossible for the Plaintiffs to obtain education and care for their children while adhering to their religious beliefs. The Defendants' selection of the most draconian means to further their interests dooms Conn. Gen. Stat. § 10-204a in a strict scrutiny analysis. Thus, the Plaintiffs ask the Court to find that they have demonstrated a likelihood of success on the merits of their Free Exercise claims.

### B. The Plaintiffs demonstrate a likelihood of success on the merits of their free speech claim under the First Amendment.

The Plaintiffs advance two theories on their free speech claim in this matter. First, the Defendants have conditioned their state constitutional right to provide and receive an education[4] on the utterance of speech with which they do not agree. Second, the Defendants' enforcement of Conn. Gen. Stat. § 10-204a prohibits them from engaging in expressive activity that is constitutionally protected.

---

[4] Conn. Const. Article Eighth, § 1.

With respect to the Plaintiffs' first theory, it is well-established that government cannot compel speech as a condition of receiving a government benefit without violating the First Amendment. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714–17 (1977) (finding unconstitutional requirement that drivers, as condition of using the roads, display state motto "Live Free or Die" on license plates); *Speiser v. Randall*, 357 U.S. 513, 518–19 (1958) (finding unconstitutional requirement that veterans, as condition of receiving property tax exemption, declare that they do not advocate the forcible overthrow of government); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633, 642(1943) (finding unconstitutional requirement that schoolchildren, as condition of going to school, salute the flag; stating that such "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence").

In this case, the Defendants' ultimatum to MCC, Pastor Loomer, and Ms. Parady operates as a demand for them to utter speech that they fundamentally disagree with as a matter of conscience. The Defendants have demanded that MCC, Pastor Loomer, and Ms. Parady inform the parents of the students in their care that they must vaccinate their children or to expel them if they decline to vaccinate their children. Dkt. 1, ¶¶ 39-40. Since the issue of vaccination is inextricably intertwined with MCC, Pastor Loomer, and Ms. Parady's spiritual message regarding the immorality of vaccinations, the Defendants have functionally interjected themselves into MCC, Pastor Loomer, and Ms. Parady's communication of theology to those that they minister to. Additionally, the Defendants seek to compel MCC, Pastor Loomer, and Ms. Parady to communicate a message of non-acceptance to the parents of their students who are not vaccinated by expelling them – a message that directly contradicts MCC's teachings. *Id.* at ¶¶ 39-40. If MCC, Pastor

Loomer, and Ms. Parady do not comply, the Defendants will close their educational ministries' doors and strip them of their state constitutional right to educate children.

Likewise, the Defendants have conditioned Jessica Cavarretta's access to an education for her three-year-old son on an act that, by its commission, would express a direct disobedience to her sincerely held religious beliefs. By completely depriving Cavaretta's son of access to preschool care if he is not vaccinated, the Defendants seek to compel Cavaretta to acknowledge that vaccination is not immoral.

The First Amendment's Free Speech Clause prohibits the Defendants from attempting to compel by blackmail any of the Plaintiffs to express, by deed or act, that vaccination is not immoral.

With respect to the Plaintiffs' second theory, it is also well-established that the First Amendment prohibits government from preventing individuals from engaging in speech or expressive conduct because of its disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (compiling cases). Thus, content-based regulations are presumptively invalid. *Id*.

MCC, Pastor Loomer, and Ms. Parady have, and continue to, communicate a message of putting obedience to God first through their educational ministries for over 30 years. Dkt. 1, ¶ 24. Within their expression of church doctrine, they have consistently communicated to the parents and students in their spiritual charge the sanctity of life, the importance of bodily holiness, and the importance of not taking part in other people's sin. *Id*. at ¶¶ 31-33, 35, 45-49. Since the expression of church doctrine requires physical acts – not obtaining a vaccine – MCC, Pastor Loomer, and Ms. Parady have both

communicated that to the parents and children in their spiritual charge and lived that expression by not honoring their students' religious convictions.

The Defendants have taken issue with MCC, Pastor Loomer, and Ms. Parady's expression of doctrine and physical obedience to God, and, through the enforcement of Conn. Gen. Stat. § 10-204a, they seek to prevent MCC, Pastor Loomer, and Ms. Parady from continuing to teach this way of life to parents and students alike by closing their doors if the content of their expressive messages and conduct do not conform to the state's demands. Since the Defendants' objection to MCC, Pastor Loomer, and Ms. Parady's expressions is content-based, the Court should apply the well-established presumption of unconstitutionality and find the Defendants' attempt to prohibit MCC, Pastor Loomer, and Ms. Parady's expressions unconstitutional.

### C. The Plaintiffs demonstrate a likelihood of success on the merits of their freedom of association claim under the First Amendment.

The Supreme Court has recognized a First Amendment right to "freedom of association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). While it has not fully defined the contours of this right, the Supreme Court has described it as follows: "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id*. at 622 (compiling case examples). Among the cases that it cited as implicating the right to freedom of association were *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (striking down an Oregon statute that required all children to attend public school) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (holding that Wisconsin could not force Amish parents to educate their children past the eighth grade).

26

*Roberts* subsequently cautioned that the right to freedom of association is not absolute and that "[i]nfringements on that right may be justified regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id*. at 623.

There is no question that the Plaintiffs seek to associate with each other and other like-minded individuals for the purpose of educating and caring for their children in an environment that offers both a quality education and spiritual nurturing. Dkt. 1, ¶¶ 24, 29. Of particular importance to the Plaintiffs' desired association is their shared belief in the sanctity of life, the importance of bodily holiness, and the importance of not taking part in other people's sin. *Id*. at ¶¶ 31-33, 35, 45-49, 55-57. Since these beliefs have led the Plaintiffs to the conclusion that vaccination would violate their spiritual responsibility to God, they have formed an association within MCC's educational ministries to educate their children in accordance with their sincerely held religious beliefs.

Conn. Gen. Stat. § 10-204a and the Defendants' interpretation and enforcement of it, however, completely deprives the Plaintiffs of their rights to freedom of association. It leaves them no freedom to associate with each other in any manner resembling a school, a daycare, or a pre-school – even under the auspices of a religious ministry – without subjecting them to § 10-204a's vaccination mandate in violation of their religious beliefs. In other words, to associate with each other for educational purposes, the Defendants demand that the Plaintiffs abandon their sincerely held religious beliefs pertaining to vaccination.

Nor is this deprivation viewpoint neutral. The Defendants do not require the Plaintiffs and their children to be vaccinated as a precondition of attending Sunday school for religious education – a regular gathering that rivals the size of daycare or preschool attendance. They do not require the Plaintiffs and their children to be vaccinated to form a church baseball team to play other churches' baseball teams. They do not require the Plaintiffs and their children to be vaccinated before going to a crowded Connecticut beach. Instead, the Defendants' sole imposition of a vaccination requirement on the Plaintiffs and their children is when they attempt to pursue an education that is in accordance with their Christian beliefs. That alone dooms the Defendants' conduct and Conn. Gen. Stat. § 10-204a in a First Amendment analysis.

As stated previously, the sheer harshness of how far the Defendants have gone here cannot be overstated, and they had many ways by which they could have more narrowly tailored their "solution." The Defendants articulated a concern that parents were exploiting religious exemptions for improper purposes. They could have easily redressed that concern by reforming the religious exemption process to require parents to complete sworn statements explaining their religious beliefs and requiring a presentation on the importance of taking vaccinations and common misconceptions about them. They could have permitted the Plaintiffs and similarly situated parents the ability to send their children to private religious schools, pre-schools, and daycares without forcing them to choose between their faith and their children's futures, thus mitigating a substantial portion of the problem that the Defendants perceive in public schools.

If the Defendants' concern is that too many exemptions to vaccination requirements pose a danger to public health, they could have articulated a threshold

percentage of vaccinated students needed to achieve herd immunity and divided exemptions to the vaccination requirement in a non-discriminatory manner between medical and religious objectors. They chose not to do that.

Instead, the Defendants seek to isolate and break the spirit of every parent and child whose religious beliefs will not allow them to comply with § 10-204a's mandate. The First Amendment does not permit them to go to such lengths to prohibit the assembly and association of people of faith because of its distaste for the religious and educational objectives that they are pursuing. Thus, the Court should find that the Plaintiffs have demonstrated a likelihood of success on the merits of their freedom of association claim.

### D. The Plaintiffs demonstrate a likelihood of success on the merits on their Equal Protection claim under the Fourteenth Amendment.

While age is not a standalone suspect classification for Fourteenth Amendment Equal Protection Clause claims,[5] the Supreme Court has held that a state's age-based classification is subject to strict scrutiny when it burdens the exercise of a fundamental right. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-313 (1976). Since the Plaintiffs show that Conn. Gen. Stat. § 10-204a and the Defendants' conduct burden their fundamental constitutional rights, strict scrutiny is applicable here, and both Conn. Gen. Stat. § 10-204a and the Defendants conduct cannot survive it.

The Supreme Court has already recognized that the free speech and freedom of association rights guaranteed by the First Amendment are fundamental for purposes of an Equal Protection Clause analysis. *Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968); *see also Murgia*, 427 U.S. at 312 n.3. Supreme Court precedents also firmly establish that the

---

[5] *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1990) (holding that courts may apply rational basis scrutiny to standalone age discrimination claims).

freedom to exercise one's religion is a fundamental constitutional right. *See Cantwell v. State of Connecticut*, 310 U.S. 296, 307 (1940) ("The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited…"); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (same). Finally, the Supreme Court has established that parents have a fundamental constitutional right to direct their children's rearing. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000).

These cases, however, do not require the Plaintiffs to plead plausible First Amendment claims as a prerequisite to receiving strict scrutiny on their Equal Protection claims. Instead, they require the Plaintiffs to demonstrate a burden on a fundamental constitutional right – a far different hurdle to overcome than pleading a claim through *Smith*'s "neutrality" and "general applicability" standard. *Rhodes*, 393 U.S. at 30-31.

*Rhodes* is particularly illustrative of this rule. In *Rhodes*, the Ohio American Independent Party and the Socialist Labor Party brought equal protection challenges to an Ohio election law that required new political parties to obtain petitions signed by voters totaling 15% or more of the total ballots cast in the last gubernatorial election as well as other laws that made it impossible for any political party except the Republican and Democratic parties to get on the ballot. *Id*. at 24-26. The parties only brought equal protection claims. *Id*. at 26.

*Rhodes'* analysis devoted no time to discussing whether the parties could have stated claims for freedom of association or the right to vote, and it did not slam the courthouse door because the parties failed to bring those claims. *Id*. at 30-31. Instead, the Supreme Court focused on analyzing the unequal burdens placed on the rights of the Ohio American Independent Party and the Socialist Labor Party. *Id*. at 31. It found the

burdens on their fundamental constitutional rights to be substantial enough to require strict scrutiny. *Id*. at 31.

In other words, the *Rhodes* analysis does not require the Plaintiffs to plead First Amendment claims that can survive tests such as the *Smith* standard, but rather whether Conn. Gen. Stat. § 10-204a and the Defendants' conduct unreasonably burden their rights to freely exercise their religion, freely associate with each other, and freely direct their children's rearing.

Conn. Gen. Stat. § 10-204a and the Defendants' application of it to the Plaintiffs do not merely burden the Plaintiffs' rights to freely exercise their religion or freely direct their children's rearing. Instead, they completely prohibit them from freely exercising their religion and educating their children or obtaining daycare for them.

The instant case proves that the Plaintiffs' claim of a complete deprivation is no exaggeration. While Conn. Gen. Stat. § 10-204a purports to protect public health by requiring children in public and private schools, daycares, and preschools to receive certain vaccinations despite their religious beliefs, the Defendants' interpretation and application of it transcends secular institutions. Instead, the Defendants have figuratively battered down the church door and literally sought to interpose their regulations between the Plaintiffs and God in church schools, daycares, and preschools with no regard or respect for the Plaintiffs' religious convictions. In other words, Conn. Gen. Stat. § 10-204a and the Defendants' application of it leave the Plaintiffs no place where they can remain faithful to their religious convictions while securing their children's future by providing them with the education necessary to be contributing members of society.

Conn. Gen. Stat. § 10-204a, however, exempts children who were already enrolled in kindergarten through grade 12 from the state's crackdown on people of faith by creating an age-based classification between parents and children who are permitted to exercise their religious beliefs freely and parents and children who are not. The results are ludicrous, and Plaintiff Cavaretta exemplifies the ridiculous arbitrariness of the classification. Her oldest child attends a Christian school in Connecticut and retained their religious exemption because they were old enough and had a prior religious exemption on file with their school. Dkt. 1, ¶ 54. The Defendants, however, will not allow her to raise her three-year-old son in the same religious beliefs as she raised her oldest child simply because he was not old enough at the time that the General Assembly enacted Public Act 21-6. The Defendants now seek his expulsion from Little Eagles. *Id.* at ¶ 54.

 In sum, Conn. Gen. Stat. § 10-204a is a law that functionally says "if you were old enough at the time this act becoming law, we will respect your religion. If not, too bad. Your religious convictions do not matter."

The substantial burden to the Plaintiffs' religious beliefs cannot be overstated. Conn. Gen. Stat. § 10-204a inevitably will create a class of second-class citizens on the basis of their religious convictions and their age. The Defendants' application of it will reach into churches and religious institutions of learning. The Plaintiffs will face impossible odds to educate their children if they do not abandon their religious beliefs, and the consequences will devastate their children's futures by diminishing or completely depriving them of opportunities to attend college, obtain white-collar jobs, or be competitive for more career-drive blue-collar jobs. Their children will also face additional difficulties in exercising their rights to vote, serve on juries, and participate in the basic

functions of a self-governing society. In other words, the burden that Conn. Gen. Stat. § 10-204a imposes on children and their parents who exercise their religious beliefs will have devastating and lifelong consequences.

Thus, strict scrutiny does apply to Conn. Gen. Stat. § 10-204a's and the Defendants' age discrimination, and neither the Defendants' conduct nor Conn. Gen. Stat. § 10-204a can survive it. The Defendants lack any compelling interest to discriminate against the Plaintiffs on the combined bases of age and religion, and they have practically conceded their lack of a compelling interest by the age-based classification that they drew. If the Defendants' interest truly lay in effectively guarding against a danger to public health posed by religious objections to vaccinations,[6] the Defendants would have mandated that all children currently attending kindergarten through grade 12 be vaccinated despite their religious exemptions. The Defendants failed to create that mandate in Conn. Gen. Stat. § 10-204a. Instead, they allowed all children who were attending kindergarten through grade 12 as of April 28, 2021 with a religious exemption to keep their exemptions. In other words, every child enrolled in kindergarten through grade 12 with a religious exemption as of April 28, 2021 and who is still enrolled in kindergarten through grade 12 poses the same "danger" that the Plaintiffs' children supposedly do, and they will continue to pose that "danger for at least another decade.

No compelling interest exists to justify allowing one class of children and their parents to freely exercise their religious beliefs and denying another class of children and their parents the right to freely exercise their religious beliefs because the children were too young at the time that Public Act 21-6 was enacted. Thus Conn. Gen. Stat. § 10-204a

---

[6] The Plaintiffs do not concede that the Defendants' interest in protecting public health outweighs their First Amendment right to freely exercise their religion under any circumstances.

and the Defendants' conduct constitute invidious discrimination that is just as unconstitutional as other form of discrimination – e.g. race-based discrimination – that American courts have declared unconstitutional and abhorrent.

Even assuming *arguendo* that the Defendants can assert some sort of compelling state interest, the Defendants have made no effort to narrowly tailor Conn. Gen. Stat. § 10-204a or their application of it to lessen the impact of invidious age discrimination. They have completely foreclosed any avenue for the Defendants to obtain private daycare, pre-school, and primary care and secondary education without violating their religious. Adding a constitutional travesty to a constitutional injury, they have foreclosed all avenues by intruding into a church and religious institution of learning – a place where they could have easily granted people of faith tolerance for their faith without comprising any of their putative public health goals.

Additionally, Conn. Gen. Stat. § 10-204a and the Defendants have made no provision for private, public, or religious schools to offer remote learning on a permanent basis to parents and children who assert a religious objection to taking vaccines. They have made no provision for private, public, or religious schools to offer separate, but equal facilities for parents and children who will not betray their faith by taking a vaccine.[7] In other words, viable alternatives exist that would permit the Defendants to fulfill their public health interests while permitting the Plaintiffs to enjoy the constitutional freedom that birthed the United States – the freedom to exercise their religion – which even the Defendants did not dare to touch for those children who are old enough to claim it. The

---

[7] If the Defendants struck this "yellow Star of David" course, the Supreme Court's decision in *Brown v. Board of Educ.*, 347 U.S. 483 (1954) would likely require the Court to declare it unconstitutional. The Plaintiffs, however, would rather incur the invidious discrimination created by *Plessy v. Ferguson*'s "separate but equal doctrine" rather than betray their faith. 163 U.S. 537 (1896).

Defendants, however, have completely disregarded these alternatives and have adopted a law and a course of conduct that robs parents of the sanctuary of their churches and forces an appalling choice on them: abandon their religious beliefs or watch their children be completely marginalized in society. Thus, under no circumstances, can Conn. Gen. Stat. § 10-204a and the Defendants' conduct be said to have been narrowly tailored to meet a compelling state interest, and both fail strict scrutiny.

For these reasons, the Court should find that the Plaintiffs have demonstrated a likelihood of success on the merits of their Equal Protection claim.

### E. The Plaintiffs demonstrate a likelihood of success on the merits on their childrearing claim under the Fourteenth Amendment.

The Supreme Court has left no doubt that the right of parents to direct their children's rearing is a fundamental constitutional right: "The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). This right plainly recognizes that parents will assert spiritual concerns in raising their children that the state simply cannot assert: "[T]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) (striking down an Oregon law that compelled public school attendance).

These precedents clearly establish that responsibility and supreme authority for a child's well-being lies with that child's parents and that the state may not supersede parents' beliefs on how to raise their children in the name of protecting the child without a very compelling and narrowly tailored reason. *See Wisconsin v. Yoder*, 406 U.S. 205,

215 (1972) (upholding the right of the Amish to withdraw their children from school after the eighth grade). Thus, *Troxel*, *Pierce*, and *Yoder* unequivocally stand for the proposition that the Plaintiffs possess a fundamental right to control and otherwise direct the upbringing of their children, including opting to decline a medical treatment that violates their sincerely held religious beliefs. *See also Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) (holding that there is a fundamental constitutional right to refuse medical treatment).

While the Plaintiffs recognize that the Second Circuit held in *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015) that there are no freestanding substantive due process rights under the Fourteenth Amendment that prohibit the state from mandating vaccination as a condition of school attends, *Phillips* is inapplicable to this case. The *Phillips* plaintiffs did not claim any form of fundamental unenumerated rights, and they only advanced an untethered substantive due process claim under the Fourteenth Amendment – precisely the same sort of generalized liberty claim that the Supreme Court itself rejected in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The Plaintiffs in the instance case, however, have advanced unenumerated rights claims that the Supreme Court has both recognized and declared those rights to be fundamental. Thus, they are entitled to strict scrutiny on their child-rearing claims.

As previously discussed, Conn. Gen. Stat. § 10-204a cannot survive strict scrutiny. Thus, the Plaintiffs ask the Court to find that they have demonstrated a likelihood of success on the merits of their child-rearing claim under the Fourteenth Amendment.

**III.    The Balance Of Hardships Tips Decidedly Toward The Plaintiffs.**

The hardships that the Defendants' enforcement of Conn. Gen. Stat. § 10-204a will cause the Plaintiffs cannot be overstated. Federal case law is well-populated with repeated references to the importance of education. *See, e.g.*, *Brown v. Board of Ed. Of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 493 (1954) ("[Education] is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education"). Connecticut itself recognized this importance by guaranteeing every child a state constitutional right to a free and adequate public education. *See* Conn. Const., Article Eighth, § 1. Despite these professions of its importance, the Defendants are actively working to deny the Plaintiffs any form of education for their children because of their religious beliefs.

The Defendants have gone to extraordinary lengths in their efforts too. Rather than leaving the Plaintiffs alone within the sanctuary of their church's educational ministries, the Defendants have threatened, and will, close the Plaintiffs' church's educational ministries if they do not submit church doctrine to the state's demands. If the Plaintiffs are not safe to practice their faith in their own church and associate with others of a like mind under the shelter of their church to educate their children, where do they go from here?

The answer is nowhere. Churches such as MCC stand as the last bastion of refuge for people of faith such as Jennifer Cavarretta to educate their children in accordance

with their religious beliefs. If the Court denies the Plaintiffs relief and the Defendants succeed in closing MCC's educational ministries, the Plaintiffs literally have no other options to provide an adequate education for their children in the state of Connecticut. *Brown* forecasts the consequences of such a circumstance – namely, the Plaintiffs' children being unable to participate in the basic functions of our self-governing republic.

The Defendants have already driven the Plaintiffs' children out of public and private secular schools through their enforcement of Conn. Gen. Stat. § 10-204a. By any fair measure of analysis, they have been able to take substantial steps toward fulfilling any public health goals that they might have through the enforcement of Conn. Gen. Stat. § 10-204a against the majority of schools, daycares, and preschools in Connecticut. Their public health interests will not suffer in any meaningful way from the Court issuing a temporary restraining order or a preliminary injunction to allow religious institutions to adhere to their faith and provide a way for the Plaintiffs to educate their children while it considers the merits of this case.

Thus, the Plaintiffs ask the Court to find that the balance of hardships substantially tips toward them.

## IV. Issuing A Temporary Restraining Order And A Preliminary Injunction Is In The Public Interest.

The rights to religious freedom, free speech, freedom of association, equal protection of the law, and the right of parents to direct child rearing are enshrined as fundamental rights in the United States Constitution. The right of the Plaintiffs to a free and adequate education is enshrined in Article Eighth, § 1 of the Connecticut Constitution. The repeated efforts that people of the United States and the people of Connecticut have

made to articulate the public's supreme interest in protecting all of these rights cannot be clearer.

While protecting the public health of children in schools is undoubtedly an important public interest, it can only go so far. As the Supreme Court indicated in *Roman Catholic Diocese of Brooklyn v. Cuomo*, even in public health emergencies, "the Constitution cannot be put away and forgotten." 141 S.Ct. 63, 68 (2020). This principle has held especially true in the context of the Supreme Court's First Amendment cases concerning religion where it has required state defendants that "public health would be imperiled" by less restrictive measures. *Id*. at 68.

Here, the Plaintiffs have both proposed less restrictive measures and are asking the Court to constrain the application of Conn. Gen. Stat. § 10-204a to be less restrictive. Their requested relief – at least as the temporary restraining order – would permit their children to continue to receive care and education in accordance with their Christian faith within MCC's educational ministries without affecting the Defendants' application of Conn. Gen. Stat. § 10-204a to public and private secular institutions.

This proposal poses no measurable risk to the Defendants' public health interests and no broader disruption to their efforts to effectuate those interests throughout the state. Additionally, it would preserve the status quo until both the Plaintiffs and the Defendants have had an opportunity to assemble a sufficient record on the preliminary injunction application for not only the Court to adequately review but also for the Second Circuit and the United States Supreme Court to review if necessary. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 287-88 (2d Cir. 2021) ("With a record as undeveloped on the issue of comparability as that presented here, we cannot conclude that the above

vaccination requirements are per se not generally applicable, as Plaintiffs' argument would have it, so as to support a preliminary injunction at this time").

## **CONCLUSION**

The Plaintiffs seek narrow and individual relief through their motion for a temporary restraining order, only asking the Court to enjoin the Defendants from enforcing Conn. Gen. Stat. § 10-204a against them, forcing them to expel unvaccinated children from MCC's educational ministries, or forcibly closing MCC's educational ministries on the basis that they have unvaccinated children. This narrowly tailored relief would protect the Plaintiffs' constitutional rights and their children's educational opportunities and leave them undisturbed in the sanctuary of their church's ministries until the Court has an opportunity to thoroughly consider and rule on the merits of their claims.

There is a record to be developed in this case by diligent adversarial presentation, including one that the Plaintiffs intend to seek permission to supplement on their motion for a preliminary injunction. The Defendants' public health interests will not be harmed by the Court preserving the status quo until it has a fully developed record, and the Plaintiffs' children will greatly benefit from continuing their care and education in MCC's nurturing and faith-based environment.

Thus, for the foregoing reasons, the Plaintiffs respectfully request that the Court grant their emergency motion for a temporary restraining order and a preliminary injunction.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com


## CERTIFICATION OF SERVICE

The Defendants have not appeared in this matter yet. The undersigned has identified their appropriate legal representatives though and will provide them with copies of the foregoing immediately after he has verified that it has been electronically filed on the foregoing date. He will provide notice to the Court as soon as he has confirmed their receipt of the foregoing.

The counsel who the undersigned will notify will be:

Darren Cunningham, Esq.
Cynthia Mahon, Esq.
Office of the Connecticut Attorney General
165 Capitol Ave.
Hartford, CT 06106

/s/ Cameron L. Atkinson /s/