**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MILFORD CHRISTIAN CHURCH; et al.  :
                                  :    DKT No.: 3:23-cv-00304 (VAB)
        Plaintiffs,               :
                                  :
v.                                :
                                  :
CHARLENE M. RUSSELL-TUCKER,       :
in her official capacity only, et al.  :
                                  :
        Defendants.               :    November 14, 2024

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS'**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

For the reasons contained herein, the Plaintiffs – Milford Christian Church (MCC), Pastor James Loomer, Janet Parady, and Jessica Cavaretta – respectfully request that the Court deny the Defendants' motion to dismiss all of the claims in their first amended complaint. Dkt. 48.

**FACTUAL BACKGROUND**

**I.      Public Act No. 21-6:**

On April 27, 2021, the Connecticut General Assembly passed Public Act No. 21-6. Dkt. 39, ¶ 9. Governor Lamont signed it shortly thereafter, and it took effect immediately. *Id*. at ¶ 9. The act imposes a vaccination requirement as a prerequisite for daycare, preschool, and school attendance in Connecticut, but allowed for religious and medical exemptions. *Id*. at ¶ 11. The act eliminated the religious exemption to the vaccination requirement. *Id*. at ¶ 10.

The practical effect of the amendment was to require parents of children enrolled in preschool or any other prekindergarten programs – public or private – to vaccinate their children on or before September 1, 2022 or not later than fourteen days after transferring

**ORAL ARGUMENT REQUESTED.**        1

to another program and to submit proof of that vaccination to their school even if vaccinating their children is contrary to their religious beliefs. *Id*. at ¶ 10.

Public Act No. 21-6, however, contained what is colloquially referred to as a "grandfathering" provision. *Id*. at ¶ 12. The "grandfathering" provision permits parents of children enrolled in kindergarten through grade 12 prior to April 28, 2021 to vaccinate their children if vaccinating their children is contrary to their religious beliefs and they has already claimed a religious exemption with their school or kindergarten. *Id.* at ¶ 12.

Finally, Public Act No. 21-6 preserved secular exemptions from the vaccination requirement in the form of medical exemptions upon the provision of a medical professional's note. *Id*. at ¶ 13.

## II.    Context Of Vaccines:

Vaccines typically consist of a virus (or a component of a virus), a liquid buffer, contaminants from the cell line used to manufacture it, commercial stabilizer, and other additives. Dkt. 39, ¶ 57. Notably, it is physically impossible to remove all cell line contaminants from a vaccine dosage. *Id*. at ¶ 58.

It is well-established that pharmaceutical companies used cell lines artificially developed from aborted fetuses to research, develop, test, and produce vaccines. *Id*. at ¶ 59. Thus, as of February 2020, the United States Center for Disease Control and Prevention (CDC) lists ten manufactured vaccines that contain or were developed and tested using cell lines artificially developed from aborted human fetal cells. *Id*. at ¶ 60. The presence of very small amounts of human fetal cells and DNA in the human blood – the kind produced when a person is injected with a vaccine – can create a very strong

autoimmune reaction in a person by which their own body turns against itself and starts killing its own cells and tissues. Dkt. 39, ¶ 62.

## III.    Milford Christian Church

Milford Christian Church (MCC) is a nonprofit church in Milford, Connecticut and has approximately 50 members. *Id*. at ¶¶ 65-66. In addition to conducting traditional church services, Milford Christian Church operates various ministries focused toward the spiritual needs of its community, including but not limited to holding prayer vigils and witnessing outside of Connecticut abortion clinics, a kids church, a pre-kindergarten daycare and preschool known as Little Eagles, and the Milford Christian Academy – a school that provides grades K-12 education. *Id*. at ¶ 68. Milford Christian Church holds the doctrinal view that these ministries are evangelistic in nature and biblically commanded by Jesus himself. *Id*. at ¶ 69-71.

MCC's foundational principle that animates each of its ministries is to provide its members with spiritual education and edification in a world that has lost touch with God. *Id*. at ¶ 72. In particular, its educational ministries employ "The Principal Approach" – a rigorously Biblical and practical view of life and education in which God is the center of attention and informs both education and worldview. *Id*. at ¶ 72.

Its educational ministries start right from daycare and preschool activities. *Id*. at ¶ 74. Through its daycare and preschool, Little Eagles, MCC helps children learn about themselves and their world through a biblical lens, learn appropriate communication and social skills with respect for Christ's teachings, and develop a strong Christian character premised on self-confidence and self-discipline. *Id*. at ¶ 74. Once a student is ready to enter formal education in the grades K-12, MCC offers a continued ministry to both their

education and souls through Milford Christian Academy. *Id*. at ¶ 75. From a practical perspective, MCC's approach has been extremely successful with approximately 95 percent of Milford Christian Academy's graduates being accepted to college. *Id*. at ¶ 76.

Two of MCC's fundamental principles and teachings of faith are relevant to this case. First, MCC teaches the sanctity of all life, and it holds as a doctrinal tenet of faith that life begins at the moment of conception. *Id*. at ¶ 79. Thus, it holds and teaches that the abortion of an unborn fetus is the intentional, premeditated murder of an innocent and pure life. *Id*. at ¶ 79. Second, MCC relies on St. Paul's first epistle to the Corinthians, chapter 6, verses 19-20 to teach that Christians' bodies are the temples of the Holy Spirit and that they have a responsibility to keep their bodies pure and holy before God. *Id*. at ¶ 80. In particular, this teaching prohibits MCC members from consuming products that might cause them or their children physical harm. *Id*. at ¶ 80.

In practice with respect to the issue of vaccines, MCC relies on St. Paul's first letter to Timothy, chapter 5, verse 22 to teach that its members should not take part in other people's sin by consuming vaccines manufactured, tested, or otherwise developed using cell lines artificially developed from murdered unborn babies. *Id*. at ¶ 81. Additionally, MCC instructs its members that they should weigh within their own consciences whether vaccines would defile their bodies in the spiritual sense before God. *Id*. at ¶ 82. Consistent with these teachings and tenets of faith, MCC has long declined to enforce a vaccination requirement on its students and their parents. *Id*. at ¶ 83.

## IV.    Pastor James Loomer, Janet Parady, And Jessica Cavaretta:

Affectionately known to his flock as "Pastor Jim," Pastor James Loomer has served as the senior pastor of MCC for over 32 years. *Id*. at ¶ 90. During his service as senior

pastor, he has expanded MCC's ministries to include educational ministries, including Little Eagles and Milford Christian Academy. *Id*. at ¶ 91. Pastor Loomer's responsibilities as senior pastor include establishing MCC's doctrine and teachings and ensuring that they are followed throughout its ministries. *Id*. at ¶ 92. Thus, he has established MCC's doctrinal tenets of faith pertaining to the sanctity of life, abortion, the holiness of the Christian body, and vaccines. *Id*. at ¶¶ 93-96.

Likewise, Janet Parady operates and manages Little Eagles' Daycare and Preschool for MCC. *Id*. at ¶ 4. As someone entrusted with ministry for MCC, she is required to, and does, profess, believe, and apply MCC's teachings pertaining to the sanctity of life, abortion, the holiness of the Christian body, and vaccines personally and within the ministry with which MCC has entrusted her with. *Id*. at ¶ 97.

Jessica Cavarretta is a mother whose three-year-old son attends Little Eagles pre-school and daycare. *Id*. at ¶ 102. She holds the sincere religious belief that to use or benefit from the use of cell lines artificially developed from an aborted fetus is morally and spiritually wrong. *Id*. at ¶ 104. She also holds the since religious belief that injecting her son with a vaccine would pollute his body as the temple of the Holy Spirit. *Id*. at ¶ 105. Cavarretta has not vaccinated her older child who has been allowed to keep their religious exemption under Connecticut's "grandfathering" provision. *Id*. at ¶ 103. She maintains the same attitude toward vaccinating her three-year-old son for religious reasons. *Id*. at ¶ 106.

## V.    The Defendants' Ultimatum And The Outcome:

On or about Wednesday, March 1, 2023, Inspector Bridget Merrill from the Connecticut Office of Early Childhood conducted an annual inspection of Little Eagles – MCC's daycare and preschool ministry. *Id*. at ¶ 85. She cited MCC for honoring certain

students' religious objections to vaccines, including the flu vaccination, and ordered MCC to submit a corrective action plan by March 15, 2023 to bring its students up to date on their vaccinations. *Id*. at ¶ 86.

When MCC personnel pressed her about MCC's options and their doctrinal teachings, Inspector Merrill delivered a three-headed ultimatum to MCC: (1) Submit a corrective action plan outlining a catch-up schedule for the children's vaccinations; (2) expel the non-vaccinated children; or (3) the OEC would close Little Eagles. *Id*. at ¶ 87. As the Plaintiffs saw the ultimatum, it roughly translated into the following unconscionable choices: "(1) Abandon your deeply held religious beliefs to obey the state; (2) violate the biblical command given by Christ himself in the Gospel of Mark, chapter 12, verse 31 to love your neighbor as yourself; or (3) face the closure of an essential ministry that Milford Christian Church has conducted for many years." *Id*. at ¶ 88. All of these options would have required MCC to violate its fundamental professions of faith. *Id*. at ¶ 89.

After the Plaintiffs sought emergency relief from the Court, the parties reached an understanding to preserve the status quo in Milford Christian Church's ministries while this case remains pending.

Further facts will be supplemented below.

## <u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(1), a district court lacks subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate it, and the Plaintiffs bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The Court must take all facts as alleged in the complaint as true and draw all

reasonable inferences in favor of the plaintiffs. *National Resources Defense Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006). It, however, may resolve disputed factual issues related to jurisdiction by referencing extrinsic evidence, such as affidavits. *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F.Supp.2d 293, 298 (D.Conn. 2009).

The standard is similar on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). The Court must take all factual allegations in the complaint as true, construe the complaint in the light most favorable to the Plaintiffs, and draw all inferences in the Plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013). If the Plaintiffs state a plausible claim for relief, the Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) must be denied.

## ARGUMENT

I. **Count One Of The Plaintiffs' First Amended Complaint Survives The Defendant's Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted.**

The Defendant moves to dismiss the Plaintiffs' Free Exercise claim for failure to state a claim upon which relief may be granted and for lack of standing. Dkt. 48-1, pp. 5-11. Her arguments address six points: (1) the Plaintiffs lack standing to challenge Connecticut vaccination laws as they pertain to K-12 schools; (2) stare decisis and the law of the case doctrine require dismissal; (3) the legacy provision does not apply to preschools and daycares; (4) Conn. Gen. Stat. § 19a-77(b)(8) does not include institutions that host activities similar to daycares and preschools if they meet the conditions of a temporary religious gathering; and (5) temporary exemptions for homeless and foster children are incomparable to religious exemptions.

The stakes remain the same for the parties. *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130, 156 (2d Cir. 2023) already determined that Public Act No. 21-6 survives rational basis review. Defendant Bye prevails if rational basis review applies. The Plaintiffs, however, survive her motion to dismiss if strict scrutiny applies.

The Plaintiffs respond to Defendant Bye's argument, preserve additional arguments for appellate review, and explain why they prevail under strict scrutiny. For the reasons explained below, the Court should deny the Defendant's motion to dismiss their Free Exercise claim.

### A. The Plaintiffs will not seek relief as to the vaccination requirement for K-12 schools because they acknowledge that they do not have standing.

Defendant Bye argues that the Plaintiffs lack standing to challenge Connecticut vaccination laws as they pertain to K-12 schools. Dkt. 48-1, p. 7. The Plaintiffs agree that they do not have standing to challenge that statutory provision and that Defendant Bye is not an appropriate defendant. The undersigned takes full responsibility for not noticing that issue prior to filing the first amended complaint and will ultimately seek permission to amend the prayer for relief to remove Conn. Gen. Stat. § 10-204a.

The Plaintiffs, however, do not agree with any implication that Conn. Gen. Stat. § 10-204a is completely irrelevant to this case. Connecticut eliminated the religious exemption to its school vaccination requirements in one act – Public Act No. 21-6 – which focused heavily on K-12 school vaccination rates and lumped the repeal of religious exemptions for the daycare and preschool vaccination requirement into the same discussion. In other words, Connecticut enacted a comprehensive change to its vaccination requirements and treated children from daycare to grade 12 as part of one

8

long continuum. Its choices along that continuum are highly relevant to the issues of neutrality, general applicability, and under-inclusiveness that the Plaintiffs advance in their Free Exercise claim. Likewise, the data pertaining to K-12 schools also informs these same issues. *See contra* Dkt. 48-1, p. 7.

A pleading error of this nature, therefore, does not limit or constrain the Court's consideration of the Plaintiffs' claims in any way. The Court should reject any argument to the contrary.

**B. Neither stare decisis nor the law of the case doctrine require dismissal of the Plaintiffs' amended Free Exercise Claim.**

Defendant Bye argues that the Court's previous decision (Dkt. 34) dismissing the Plaintiffs' original Free Exercise claim applies to their amended Free Exercise Claim. Dkt. 48-1, p. 6. She also argues that *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (C.A.2 2023) requires dismissal "to the extent the Plaintiffs argue that school vaccination laws are not neutral and generally applicable to K-12 education." Dkt. 48-1, p. 6. Without further elaboration, she concludes that Connecticut's "school vaccination laws are neutral and generally applicable" and satisfy the rational basis test. Dkt. 48-1, p. 6.

This argument might carry the day if the Plaintiffs' amended Free Exercise claim was a mere restatement of the claim that the Court previously found to be factually deficient, but the Plaintiffs' amended Free Exercise claim is far from a mere restatement of a claim already presented. Instead, it addresses, and cures, the factual deficiencies that the Court previously identified.

First, the Plaintiffs amended the facts supporting their neutrality claim to show that religious conduct was the target of Public Act No. 21-6, not because it posed a legitimate

threat of undermining Connecticut's vaccination objectives, but because of animus toward religious beliefs that "are misguided and at odds with science." Dkt. 39, ¶ 121. Beginning with "big picture" data, the Plaintiffs show that, in 2019-2020, 96.2% of public-school kindergartners were vaccinated – 1.2% more than the 95% herd immunity for measles outbreaks recommended by the U.S. Centers for Disease Control and Prevention. *Id*. at ¶¶ 35-36. They also show that religious exemptions had declined from 2.5% to 2.3% in 2019-2020. *Id*. at ¶ 38. Nonetheless, Connecticut chose to blame religious exemptions for the 0.9% drop in school vaccination rates over the previous decade. *Id*. at ¶ 38. To reach this conclusion, Connecticut's General Assembly focused on 22% of Connecticut schools that had measles, mumps, and rubella (MMR) vaccination rates below 95%, including 26 schools that had rates below 90%. *Id*. at ¶ 40.

The Plaintiffs then moved to more detailed data. They showed that at least 3 schools had 40% non-compliance rates unrelated to any sort of exemption from Connecticut's vaccination requirements. *Id*. at ¶¶ 42-43. They also alleged that only 55 of the 120 schools that the General Assembly called out for MMR vaccination rates below 95% had 5% or greater religious exemption use. *Id*. at ¶ 45. For most of these 55 schools, they had smaller student populations so just 3 to 5 religiously exempt students had a drastic effect on the percentages – a problem that also affected medical exemptions. *Id*. at ¶¶ 46-47.

Instead of taking a detailed look at the data and the circumstances behind percentages, the Connecticut General Assembly spoke of a "day of reckoning" for religiously faithful parents and passed a law where religious conduct was the sole target of the law – Public Act No. 21-6.

Subsequent data reinforces Plaintiffs' claims that Public Act No. 21-6 targeted religion. 62 out of 492 public schools in Connecticut remain below compliance with Connecticut's stated goal of a 95% vaccination rate. *Id.* at ¶ 49. Some have simple non-compliance rates unrelated to any sort of exemption that drive their vaccination rates far below the 95% herd immunity threshold. *Id*. at ¶ 50. Others grant medical exemptions at a rate that also drives the total vaccination rate below 95%. *Id*. at ¶ 51.

In other words, Connecticut chose to, and continues to, ignore every other problem that undermines its vaccination objectives to the same or a greater collective extent than religious exemptions did. Instead, it chose to single out religious conduct, *and only religious conduct*, for categorical and virtually absolute prohibition through Public Act No. 21-6.

Second, the Plaintiffs' same discussion of data cures the factual deficiencies that the Court's prior decision identified on the "general applicability" prong. A law lacks general applicability when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1877 (2021). Laws lack generally applicability "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021). Comparability "must be judged against the asserted government interest that justifies the regulation at issue." *Id*. It "is concerned with the risks various activities pose, not the reasons why people [engage in them]."[1] *Id*. The Second Circuit describes this inquiry as examining

---

[1] *Tandon* concerned religious gatherings compared to gatherings for secular purposes. It originally used the term "gather" at the end of this sentence, but it set forth a general principle applicable to all Free Exercise cases.

"whether a law is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."[2] *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood*, 76 F.4th 130, 145 (2d Cir. 2023) (cleaned up) ("*WTP*").

The Plaintiffs' first amended complaint peels back the curtain on Connecticut's public education and childcare system's pervasive disregard for Public Act No. 21-6's stated objectives and its underlying governmental interests. It shows that secular conduct, not religious conduct, is responsible for more than 10% of Connecticut's public schools remaining non-complaint with Connecticut's stated goal of a 95% school vaccination rate. Dkt. 39, ¶ 49. The Plaintiffs' allegations show that some of these schools have simple non-compliance rates unrelated to any sort of exemption that drives their vaccination rate far below Connecticut's often-stated 95% vaccination rate. *Id*. at ¶ 50. Others pass out medical exemptions that drops their total vaccination rates below 95%. *Id*. at ¶ 51.

Permitting these schools to maintain unvaccinated student populations well below the 95% vaccination threshold that the Connecticut General Assembly made the focal point of Public Act No. 21-6 casts Connecticut's professed interest into the sewer and

---

[2] The Plaintiffs understand that the Court is bound by Second Circuit precedent, but they are also bound to preserve arguments for reconsideration by the Second Circuit or later consideration by the Supreme Court. The Second Circuit's "substantially underinclusive" standard contradicts *Tandon* by permitting governments to turn a blind eye toward secular conduct that is creatively portrayed as working *de minimis* harm on governments' professed interest while categorically prohibiting all religious conduct that allegedly undermines governments' professed interests in any way, thus creating a subtle, but systemic, disfavoring of religious conduct as a matter of legal doctrine. *Tandon* made clear that courts cannot treat the Free Exercise Clause's protections as flexibly applying only when free exercise of religion is really worth insisting upon. Instead, *Tandon* requires courts to treat as comparable for Free Exercise purposes any secular activities that undermine governments' professed interests, regardless of to what degree that they undermine them. Public Act No. 21-6 falls far short of that command.

washes it away – out of sight, out of mind. Connecticut takes no steps to curb the rampant secular failures to vaccinate its children despite those failures making a mockery of its professed interest in Public Act No. 21-6.

The Plaintiffs' allegations also show that, in 2019-20, 96.2% of public-school kindergartners were vaccinated – 1.2% more than the 95% herd immunity threshold recommended by the CDC. *Id*. at ¶¶ 35-36. Of the 3.8% of kindergartners who were unvaccinated, religious exempt kindergartners only comprised 2.3% of those students. *Id*. at ¶ 38. Thus, religious exemptions did not undermine Connecticut's interests so far as to require their categorical outlawing.

There is more. The Plaintiffs' allegations demonstrate that, in 2019-20, at least 3 schools turned in 40% non-compliance rates unrelated to any sort of exemption from Connecticut's vaccination requirements. *Id*. at ¶¶ 42-43. They further demonstrate that both medical exemptions and religious exemptions disproportionately lowered percentages in many of the schools that the Connecticut General Assembly fixated on because of those schools' smaller population size. *Id*. at ¶¶ 45-47.

These allegations cure the deficiencies identified by the Court's original dismissal of this case. They show that Conn. Public Act No. 21-6 fails a "substantially underinclusive" analysis because secular conduct – simple non-compliance – undermines Connecticut's interests in childhood vaccination to at least the same collective degree that religious exemptions do, and, indeed to a far greater extent.[3]

---

[3] The Plaintiffs do not bear a burden of proving their allegations at the motion to dismiss stage, and the Court should be wary of reading *WTP* to impose a burden of proof on them. *WTP* is best understood as imposing a burden of production on the Plaintiffs to show that they can muster sufficient factual allegations that give rise to a plausible claim

Instead of grappling with these allegations, Defendant Bye apparently invites the Court to (1) side-step them by declaring K-12 school vaccination data irrelevant to the prohibition on religious exemptions in daycares and preschools or (2) engage in a summary-judgment-style analysis of the reasons why simple non-compliance exists in Connecticut schools. Neither argument carries the day.

First, Defendant Bye's apparent argument that K-12 school vaccination data is irrelevant in this case – Dkt. 48-1, p. 7 – ignores the fact that Connecticut did not repeal religious exemptions for K-12 schools and daycares and preschools in two separate laws. It did so in one law – Public Act No. 21-6 – which targeted religious exemptions for children of all ages. Public Act No. 21-6 amended Conn. Gen. Stat. § 19a-79 to align with Connecticut's broad vaccination policy, and, during the legislative debates, the Connecticut General Assembly had no independent discussion of how or why its interest in repealing religious exemptions for daycare and preschool attendees differed from its interest in repealing religious exemptions for K-12 children.

In other words, K-12 school vaccination data drove the Connecticut General Assembly's decision to repeal religious exemptions for both K-12 schools and preschools and daycares. Since the Connecticut General Assembly made that data the rock upon which it built Public Act No. 21-6, the data is highly relevant to the Court's consideration of whether Conn. Gen. Stat. § 19a-79 – as amended by Public Act No. 21-6 – survives a Free Exercise analysis.

---

that Public Act No. 21-6 fails a general applicability analysis. The Plaintiffs have carried that burden here.

Second, Defendant Bye invites the Court to consider a justification for simple, secular non-compliance in K-12 schools: "The mere fact that certain schools may have time shot vaccination rates below herd immunity does not in any way undermine Connecticut's interests in phasing in a vaccinated school population for those whom vaccinations are medically safe." Dkt. 48-1, p. 7. The Plaintiffs made no allegations as to the reasons for simple, secular non-compliance in their amended complaint. Defendant Bye's argument, thus, is inappropriate for consideration at the motion to dismiss stage – particularly when it is not supported by any sworn assertions subject to testing by counsel in the crucible of cross-examination. The Court should decline to consider it at this stage.

Thus, the Court should find that the Plaintiffs have sufficiently alleged a Free Exercise Claim and deny the Defendant's motion to dismiss.

### C. While the legacy provision does not apply to preschools and daycares, its inclusion in Public Act No. 21-6 renders it relevant to that law's repeal of religious exemptions for preschools and daycares.

Defendant Bye also submits that "the legacy provision does not apply to preschools and daycares." Dkt. 48-1, p. 8. The Plaintiffs agree that no legacy provision applied to children enrolled in preschool or daycare at the time that Public Act No. 21-6 was enacted, but they disagree that the legacy provision is irrelevant here.

As discussed in the preceding section, Connecticut enacted a comprehensive vaccination policy change in the form of one law – Public Act No. 21-6. The Connecticut General Assembly never distinguished daycares and preschools from K-12 schools in its repeal of religious exemptions, and it relied exclusively on K-12 school vaccination data to repeal religious exemptions for daycares and preschools in addition to K-12 schools. In doing so, the Connecticut General Assembly made a judgment that preschools and

daycares were sufficiently akin to schools in all pertinent respects that distinguishing between them was unnecessary. Those pertinent respects undoubtedly included the close proximity of an assembly of children for educational purposes and the alleged dangers supposed to be created by unvaccinated children.

Any attempt to declare the legacy exemption irrelevant to an analysis of neutrality and general applicability for preschools and daycares disregards, for purposes of litigation, the relevant and pertinent similarities between K-12 schools and preschools and daycares that the Connecticut General Assembly recognized. Leaving an entire class of similarly situated children unvaccinated for religious reasons while denying it to others goes to the very heart of neutrality and general applicability.

Thus, the Court should reject Defendant Bye's arguments on this score.

### D. Defendant Bye's Non-Enforcement Of Conn. Gen. Stat. § 19-80 As To Unincorporated And Unaffiliated Groups Of Parents Hosting Daycare And Preschool Operations Creates An Issue Of General Applicability For Public Act No. 21-6.

Defendant Bye argues that the Plaintiffs' allegations pertaining to private groups of parents hosting daycare and preschool operations misapprehends the scope of Conn. Gen. Stat. § 19a-77(b)(8)'s exemption of religious activities from Connecticut's daycare and preschool licensing scheme. Dkt. 48-1, pp. 8-10. Her argument, however, lacks merit because it misapprehends the scope of the Plaintiffs' allegations, which did not focus on the appropriate statutory interpretation but rather her conduct. Bye does not respond to their allegations regarding her conduct.

Conn. Gen. Stat. § 19-80(a) provides that any "person, group of persons, association, organization, corporation, institution or agency, public or private" must obtain a license from Defendant Bye before operating a "child care center." Conn. Gen. Stat. §

16

19-77 defines a "child care center" as offering or providing "a program of supplementary care to more than twelve related or unrelated children outside their own homes on a regular basis…." This statutory scheme, however, contain numerous exceptions, including Conn. Gen. Stat. § 19a-77(b)(8). Conn. Gen. Stat. § 19a-77(b)(8) exempts, from state licensing and vaccination requirements, "religious educational activities administered by a religious institution exclusively for children whose parents or legal guardians are members of such religious institution."

The Plaintiffs alleged that Defendant Bye has allowed groups of parents – "not bound by ties of blood, association with a religious group, or joint business interests – to operate daycares and preschools in the same manner as licensed daycares and preschools, which enables them to escape Connecticut's vaccination mandate." Dkt. 39, ¶ 19. They further alleged that Bye does not vet these groups' claim that they are providing religious education activities or whether they are an actual religious institution. *Id*. at ¶ 20. This lax treatment has allowed these groups to abuse the religious exception to Connecticut's licensing requirements for daycares and preschools and conduct identical activities to daycares and preschools licensed by the state. *Id*. at ¶¶ 21, 132. It has also allowed them to completely skirt Connecticut's vaccination mandate for daycares and preschools. *Id*. at ¶ 19.

Instead of addressing the clear claim from these allegations that Connecticut is condoning a flaunting of its daycare and preschool vaccination policy, *Id*. at ¶ 132, Defendant Bye criticizes the Plaintiffs for misinterpreting the statutory licensing scheme, and she does not address any of their arguments about how she is permitting the statutory scheme to be abused to undermine Connecticut's interest in vaccinating preschoolers.

Because she failed to address these allegations, the Court should follow the well-established rule of not permitting her to raise a new argument in a reply brief. *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999).

What remains are the Plaintiffs' uncontested allegations that Defendant Bye has permitted the widespread undermining of Connecticut's preschool and daycare vaccination mandate by allowing groups of parents to abuse the religious exemption to the child care licensing requirement. Those allegations strike right at the heart of general applicability and demonstrate yet another illustration of how Connecticut's vaccination mandate is being undermined by secular conduct – even as this secular conduct cloaks itself in a religious frock.

The Court should find that these allegations are sufficient to call into question the general applicability of the Defendant's enforcement of Connecticut's vaccination mandate and deny the Defendant's motion to dismiss the Plaintiffs' Free Exercise claim.

### E. Permitting Homeless And Foster Children To Attend Daycare And Preschool Even Temporarily Undermines Connecticut's Professed Interest In Vaccination In A Manner Comparable To Religious Exemptions.

Defendant Bye claims that Conn. Gen. Stat. § 19a-79's provisions permitting homeless and foster children to temporarily enroll in preschools and daycares while unvaccinated are not comparable to religious exemptions because they are temporary. Dkt. 48-1, pp. 10-11. Her arguments miss the mark though.

Regardless of whether Conn. Gen. Stat. § 19a-79's provisions are exemptions or conditional admittance on grace periods, they still undermine Connecticut's professed interest in protecting children's health and safety through maximizing vaccination rates by

18

permitting children – unvaccinated for secular reasons – to attend daycares and preschools.

It is also not clear if the forbearance extended to homeless and foster children are actually temporary or not. The Plaintiffs' allegations demonstrate that nothing in Connecticut law describes whether the 90-day period for homeless children or the 45-day period for foster children are lifetime limits, calendar year limits, or consecutive days limits. Dkt. 39, ¶¶ 23-24. Nothing indicates that, if a child has sporadic attendance or transitory attendance at multiple daycares or preschools, whether either period would act to keep a child from attending daycares or preschools unvaccinated in consecutive 90-day or 45-day increments.

Bye attempts to skirt this reality by arguing that their admission is contingent on them providing proof of vaccination and that they are still subject to Connecticut's vaccination requirements. Dkt. 48-1, pp. 10-11. That argument, however, is not consistent with the statutory text or the Plaintiffs' allegations, which the Court must accept as true at the motion to dismiss stage.

Conn. Gen. Stat. § 19a-79(g) contains a blanket exemption from immunization requirements:

> Any child care center or group child care home may provide child care services to homeless children and youths, as defined in 42 USC 11434a, as amended from time to time, for a period not to exceed ninety days without complying with any provision in regulations adopted pursuant to this section relating to immunization and physical examination requirements.

Likewise, Conn. Gen. Stat. § 19a-79(g) contains virtually identical language: "Any child care center or group child care home may provide child care services to a foster child for a period not to exceed forty-five days without complying with any provision in

regulations adopted pursuant to this section relating to immunization and physical examination requirements."

These are not mere exemptions from documentation. They are clear exemptions for homeless and foster children from the vaccination requirement – just as the plaintiffs alleged. Dkt. 39, ¶¶ 23-24.

Permitting homeless children and foster children to receive daycare and preschool services while unvaccinated is an admirable and proper policy choice, but it is an inescapably secular one that undermines Connecticut's interest precisely the same way that permitting religiously objecting children would. For that reason, this exception – temporary though it be – also deprives Public Act No. 21-6 of its general applicability.

### F. Public Act No. 21-6 Is Not Generally Applicable Because It Permits Secular, Private K-12 Schools To Operate Free From Its Vaccination Mandate.

Defendant Bye scrupulously avoids the elephant of Connecticut's own making in this case. The Plaintiffs originally brought pre-enforcement claims against Connecticut's Commissioner for the State Department of Education, Charlene Russell-Tucker. Russell-Tucker argued that she and her department have no authority to enforce Public Act No. 21-6's K-12 vaccination mandate against private schools, which are now left to their own devices on whether to enforce the law. Dkt. 25, p. 9 ("There is no vehicle for such C.G.S. § 10-4b claims against private schools because the State Board of Education, and by extension the CSDE, has no regulatory authority over them"). The Court agreed and dismissed the claims against her for lack of subject matter jurisdiction. Dkt. 34, pp. 8-10.

No other state agency or official is authorized by Connecticut law to enforce Public Act No. 21-6's vaccination mandate against private K-12 schools, and it has essentially rendered them exempt from Connecticut's school vaccination mandate. Dkt. 39, ¶ 18.

As discussed previously, daycares and preschools are similarly situated in all relevant and pertinent respects by the Connecticut General Assembly's own approach. They each assemble children in an enclosed space in a significant group to receive educational instruction. According to Connecticut, unvaccinated children in those types of environments pose a risk to the safety and health of their fellow students. Thus, Connecticut enacted a comprehensive, statewide vaccination mandate to repeal religious exemptions for public and private schools, daycares, and preschools.

The absence of any state enforcement authority over private schools permits secular private K-12 schools to enroll students who do not wish to be vaccinated for any reason while requiring the Plaintiffs to expel students who wish to attend preschool and daycare without violating their religious beliefs.

Permitting secular, private K-12 schools to enroll students who do not wish to be vaccinated for any reason puts Connecticut's interest in "decreasing, to the greatest extent medically possible, the number of unvaccinated students… in school" through a paper shredder. *We The Patriots USA, Inc.*, 76 F.4th at 153. It defies all logical sense to impose a religiously intolerant vaccination policy on a discreet subset of private institutions and completely and intentionally strip authority to impose the same policy on all other private institutions engaged in essentially the same activities.

In other words, Public Act No. 21-6's vaccination mandates are a far cry from being generally applicable in practice. They permit private K-12 institutions to recognize secular

exemptions at will from Connecticut's vaccination mandate or to simply choose not to enforce it. Conversely, they require private pre-schools and daycares to religiously discriminate against attendees with sincere and deeply held religious beliefs against vaccinations that are unquestionably entitled to respect under the First Amendment.

Because no meaningful difference exists between secular exemptions for private K-12 students and religious exemptions for private daycare and preschool children when it comes to undermining Connecticut's interest, Public Act No. 21-6 lacks generally applicability. Thus, the Court should deny Defendant Bye's motion to dismiss the Plaintiffs' Free Exercise claim.

### G. The Plaintiffs Preserve Their Argument That Strict Scrutiny Applies Because They Present A Hybrid Rights Claim And *Smith* Is Inconsistent With The First Amendment's Text, History, And Tradition.

The Plaintiffs acknowledge that the Court, relying on Second Circuit decisions, has already rejected their hybrid-rights argument and their argument that *Smith* is inconsistent with the First Amendment's text, history, and tradition. Out of an abundance of caution, they set forth their arguments in brief here to preserve them for review by the United States Supreme Court.

First, *Employment Div. v. Smith*, 494 U.S. 872 (1990) explicitly recognized that the Supreme Court had previously held "neutrally, generally applicable law[s]" unconstitutional on Free Exercise grounds when Free Exercise claims were joined with "other constitutional protections, such as freedom of speech and of the press…." *Smith*, 494 U.S. at 881-82. It particularly recognized that *Wisconsin v. Yoder*, 406 U.S. 205, 233-34 (1972) has recognized a form of heightened scrutiny for Free Exercise claims accompanied by parental rights claims. *Smith*, 494 U.S. at 881 n.1.

The Plaintiffs have brought a hybrid Free-Exercise and parental rights claim. *Smith* and *Yoder* require the application of strict scrutiny to that claim.

Second, *Smith*'s "neutral and general applicability" analysis does not rely on the text, history, or tradition of the Free Exercise Clause, but rather on several predictions about the outcome of the rule that it fashioned out of thin air. Those predictions reduced the Free Exercise Clause to a water-down Equal Protection Clause that falls far short of the Founder's vision of strong affirmative protections for religious liberty. *See* Michael W. McConnell, *The Origins and Historical Understanding Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1471-72 & n.320 (1990) (describing the effect of William Penn's hat and its effect on the debate over the First Amendment). Interpreting the Free Exercise Clause in a manner consistent with the Founder's vision requires, at a bare minimum, returning to the strict scrutiny standard *Smith* replaced: A law imposing a substantial burden on religious exercise can only survive scrutiny if it is narrowly tailored to serve a compelling government interest. *See Sherbert v. Verner*, 374 U.S. 398 (1963).

Thus, strict scrutiny should apply here.

### H. Public Act No. 21-6's preschool and daycare vaccination mandate cannot survive strict scrutiny.

Public Act No. 21-6 cannot survive strict scrutiny. Under strict scrutiny, the Defendants must show that Public Act No. 21-6's preschool and daycare vaccination mandate is narrowly tailored to further a compelling government interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015). Defendant Bye cannot satisfy the narrow tailoring element.

Public Act No. 21-6's preschool and daycare vaccination mandate and Defendant Bye's interpretation and application of it is anything but narrowly tailored. It prohibits a

child from attending public or private daycares and pre-schools unless that child receives the vaccinations required by the state. Defendant Bye has applied Public Act No. 21-6 to religious schools and daycares such as the Plaintiffs' educational ministries while she permits other groups of unorganized, nonreligious parents to abuse the state licensing system for child care centers to skirt the vaccination mandate. Bye continues to apply Public Act No. 21-6 to the Plaintiffs despite the Act's exemptions for homeless and foster children. She continues to apply the Act against the Plaintiffs despite its complete disregard for enforcing its mandates against private K-12 schools and their students.

Connecticut had many ways by which it could have more narrowly tailored its "solution." Connecticut legislators articulated a concern that parents were exploiting religious exemptions for improper purposes. They could have easily redressed that concern by reforming the religious exemption process to require parents to complete sworn statements explaining their religious beliefs and requiring a presentation on the importance of taking vaccinations and common misconceptions about them. They could have permitted the Plaintiffs and similarly situated parents the ability to send their children to private religious pre-schools and daycares without forcing them to choose between their faith and their children's futures just as they functionally did by not creating an enforcement mechanism for private K-12 schools.

If Connecticut's concern is that too many exemptions to vaccination requirements pose a danger to public health, it could have articulated a threshold percentage of vaccinated students needed to achieve herd immunity and divided exemptions to the vaccination requirement in a non-discriminatory manner between medical and religious objectors. It chose not to do that.

Instead of selecting these reasonable alternatives, which would have struck a middle ground, Connecticut has made it impossible for the Plaintiffs to obtain education and care for their children while adhering to their religious beliefs. Defendant Bye's selection of the most draconian means to further Connecticut's interests – the forced closure of a church daycare/preschool or the forced expulsion of religiously faithful – dooms Public Act No. 21-6 in a strict scrutiny analysis. Thus, the Plaintiffs ask the Court to deny the Defendant's motion to dismiss Count One.

## II. The Plaintiffs' Establishment Clause Claim Survives The Defendant's Motion To Dismiss.

Defendant Bye asks the Court to dismiss the Plaintiffs' Establishment Clause claim on the grounds that they lack standing to challenge Public Act No. 21-6's legacy provision. Dkt. 48-1, p. 11. In the alternative, she argues that the legacy accommodation is consistent with "the type of religious accommodations that the Supreme Court has instructed are permissible." *Id*. at pp. 12-13. Both arguments miss the mark.

First, Defendant Bye's standing argument is a mere reiteration of her earlier argument that the Plaintiffs lack any standing to challenge any portions of Public Act No. 21-6 that relate to K-12 schools. At the outset, the Plaintiffs are not asking the Court to declare the legacy exemption unconstitutional and enjoin it. They are asking the Court to declare Public Act No. 21-6's failure to provide religious accommodations to all religiously conscientious children a violation of the Establishment Clause because Public Act No. 21-6 provides a religious accommodation to a narrow subset of children in the form of the legacy exemption. The nexus of their claim is not that the legacy exemption is unconstitutional, but rather that the operative vaccination mandates of Public Act No. 21-6 do not accommodate their identical religious beliefs under near-identical classroom

25

circumstances. Such a challenge does not require them to challenge the constitutionality of the legacy provision. It only requires them to challenge the operative vaccination mandate that they are subject to.

The Plaintiffs also have already explained that Public Act No. 21-6 enacted a comprehensive change to Connecticut's childhood vaccination requirements. The Connecticut General Assembly never distinguished daycares and preschools from K-12 schools in its repeal of religious exemptions, and it relied exclusively on K-12 school vaccination data to repeal religious exemptions for daycares and preschools in addition to K-12 schools. In doing so, the Connecticut General Assembly made a judgment that preschools and daycares were sufficiently akin to schools in all pertinent respects that distinguishing between them was unnecessary. Those pertinent respects undoubtedly included the close proximity of an assembly of children for educational purposes and the alleged dangers supposed to be created by unvaccinated children.

Thus, the standing issue that Defendant Bye attempts to create does not exist. The Plaintiffs' circumstances are nearly identical to the circumstances of the children favored by the legacy exemption. Public Act No. 21-6 offers religious accommodation to some children based on their age while disfavoring all other religious adherents, including the Plaintiffs. Thus, the Court should reach the merits.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Supreme Court has made clear that this protection extends to religious beliefs too: "The establishment of religion clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can

pass laws which aid one religion, aid all religions, or prefer one religion over another." *Everson v. Board of Ed. Of Ewing Tp.*, 330 U.S. 1, 15 (1947) (cleaned up).

This "clearest command" extends to situations where government seeks to accommodate religion too: "*Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny…, and that laws affording a uniform benefit to *all* religions should be analyzed under *Lemon*…."[4] *Corporation of Presiding Bishop of Church Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (cleaned up). Thus, a law's "prescriptions" must "be administered neutrally among different faiths" to be compatible with the Establishment Clause. *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).

In other words, when a government accommodates some religious believers through an exception to a law, it must accommodate all religious believers or face exacting scrutiny that examines whether the discrimination is "justified by a compelling governmental interest" and whether the accommodation is "closely fitted to further that interest." *Larson*, 456 U.S. at 247.

Public Act No. 21-6 falls far short of this constitutionally required neutrality among religious adherents. It accommodates children who engaged in certain religious conduct (asserting religious objections to vaccination) before April 28, 2021 while failing to accommodate children who engage in identical religious conduct (asserting religious objections to vaccination) after April 28, 2021. It accommodates the religious beliefs of children who are older while denying identical accommodation to younger children. The children who are not religiously accommodated may share the same education facilities

---

[4] *Kennedy v. Bremerton School District*, 142 S.Ct. 2407 (2022) abolished the *Lemon* test.

as the children whose religious beliefs Connecticut has chosen to accommodate. They pose the same threat to Connecticut's asserted interests. Dkt. 39, ¶ 142.

This so-called "legacy exemption" may very well be an exercise of Connecticut's "benevolence" toward religious exercise, but it is a far cry from "benevolent neutrality" among religions. *Walz v. Tax Comm'n of N.Y.C.*, 397 U.S. 664, 669 (1970). It creates a dividing line between the children whom Connecticut, for whatever arbitrary reasons, has chosen to accommodate and the children whom it has not chosen to accommodate. In the Plaintiffs' circumstances, that dividing marker happens to be their church building. The children who attend K-12 school on one side of Milford Christian Church enjoy religious accommodation from Connecticut. The children who attend preschool on the other side of Milford Christian Church face religious intolerance and the threat of expulsion from their preschool.

Such blatant discrimination among religious adherents is the *definition* of an Establishment Clause violation, and it does nothing to further Connecticut's professed interest in prohibiting the spread of contagious disease by maximizing to the greatest extent possible the number of vaccinated children in Connecticut schools, daycares, and preschools. In fact, it directly cuts across the face of that interest.

Thus, the Court should deny the Defendant's motion to dismiss the Plaintiffs' Establishment Clause claim.

## III. The Plaintiffs' Amended Free Speech Claim Survives The Defendant's Motion To Dismiss.

The Court initially dismissed the Plaintiffs' free speech claim on the grounds that Public Act No. 21-6's vaccination mandate only imposed an incidental burden on their speech and did not prohibit them from expressing their opinions on the school vaccination

law while still operating their program. Dkt. 34, pp. 26-27. Defendant Bye argues that the Plaintiffs' claim has not changed substantively from their initial complaint. Dkt. 48-1, pp. 13-14. She also argues that, to the extent that it has, Public Act No. 21-6 does not burden their right to engage in an expressive evangelistic ministry. *Id*. at pp. 14-15. Her contents lack merit.

First, to the extent that the Court finds that the Plaintiffs' free speech claim is unchanged and lacks additional facts, the Plaintiffs are not seeking to relitigate the Court's prior ruling. They have merely preserved their claims for further appellate review out of an abundance of caution.

Second, the Plaintiffs have added substantial facts that show more than an incidental burden on their right to free speech. Milford Christian Church operates numerous ministries, including their daycare and preschool known as Little Eagles. Dkt. 39, ¶ 68. These ministries constitute the Plaintiffs' obedience to Jesus's command to evangelize the world. *Id*. at ¶ 69. Their daycare/preschool serves a special Biblical purpose within this command because it is obedience to Jesus's command to reach children. *Id*. at ¶ 70. The Plaintiffs cannot stop engaging in these ministries because they are biblically required to. *Id*. at ¶ 71.

Milford Christian Church's ministries focus on a rigorous approach to a Biblical way of life where God is the center of attention. *Id*. at ¶ 72. This focus provides children with a faith-based education and care program that tends to children's natural and spiritual needs. *Id*. at ¶ 73. That ministry starts with Little Eagles. *Id*. at ¶ 74. The Plaintiffs cannot, and will not, stop engaging in these ministries – regardless of whether Connecticut requires them to be licensed or not. *Id*. at ¶¶ 99-100.

The Plaintiffs' ministries are indisputably an exercise of their free speech rights. To evangelize and meet people in the state that they are in, the Plaintiffs must be able to offer attractive educational opportunities to children of all ages, have a forum to speak to them consistent with the normal forums of society, and be able to operate that forum without the operation of that forum being conditioned on conduct that violates their religious beliefs.

Public Act No. 21-6's vaccination mandates – in conjunction with Connecticut's requirement that child care centers be licensed – conditions the Plaintiffs' right to operate that forum and their evangelistic ministries on compliance with conditions that violate their religious beliefs.

Defendant Bye disputes this proposition, arguing that the Plaintiffs should avail themselves of the religious exception to Connecticut's licensing requirements under Conn. Gen. Stat. § 19a-77(b). Dkt. 48-1, pp. 14-15. Her own argument, however, shows why such an alternative is impossible for the Plaintiffs. Bye indicates that parents of children must be members of the religious institution operating a religiously exempt child care center under Connecticut law. *Id*.

The Plaintiffs' allegations, however, show why they cannot meet that requirement and engage in outreach and evangelistic ministry. Membership in Milford Christian Church requires a person to meet 12 requirements – key among which is living a godly life. Dkt. 39, ¶ 67. Not everyone who sends their child to Little Eagles meets these requirements. *Id*.

The Milford Christian Church's evangelistic educational ministries would not be biblically consistent if they limited their operations to members of Milford Christian Church.

The Great Commission explicitly commands the church to "teach all nations…." *Id*. at ¶ 69. That command requires the Plaintiffs to invite members of the public who are not members of its church to Little Eagles. *Id*. at ¶ 71.

Because the Plaintiffs cannot operate Little Eagles in the restricted manner consistent with the religious exception requirements to the child care center licensing requirement, they face the forcible closure of their daycare/preschool ministry. They also face crippling sanctions for violating the licensing law.

That is far more than an incidental burden on speech. It conditions the right to create and maintain a private forum for speech on compliance with conditions that violate the very faith-based message being advocated for. It conditions the right to evangelize through ministries designed to communicate faith-based messages on conditions that require the Plaintiffs to contradict the very faith-based messages they are advocating.

Government may not compel speech as a condition of receiving a government benefit without violating the First Amendment. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714–17 (1977) (finding unconstitutional requirement that drivers, as condition of using the roads, display state motto "Live Free or Die" on license plates); *Speiser v. Randall*, 357 U.S. 513, 518–19 (1958) (finding unconstitutional requirement that veterans declare that they do not advocate the forcible overthrow of government to receive property tax exemption,); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633, 642(1943) (finding unconstitutional requirement that schoolchildren, as condition of going to school, salute the flag; stating that such "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence").

Public Act No. 21-6 and the Defendant's enforcement of it creates that exact sort of unconstitutional condition of free speech that the Supreme Court's precedents directly prohibit. Thus, the Court should deny the Defendant's motion to dismiss the Plaintiffs' free speech claims.

**IV.    The Plaintiffs Preserve Their Freedom Of Association, Equal Protection, And Child-Rearing Claims For Appellate Review.**

The Plaintiffs acknowledge that they have not expanded the factual allegations for their freedom of association, equal protection, and child-rearing claims. They are not seeking to relitigate the Court's prior decisions on those claims by including them in their first amended complaint or presenting argument here. Instead, out of an abundance of caution, they are preserving them for further appellate review by briefly presenting argument here.

First, the Plaintiffs argue that Public Act No. 21-6 violates their right to freedom of association by prohibiting them from assembling and associating with each other through the Little Eagles' ministry. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984) recognizes a right to associate with others in the pursuit of religious and educational ends. Public Act No. 21-6 burdens the Plaintiffs' right to freedom of association by conditioning their right to associate with each other on a vaccination requirement that violates the very beliefs that draw them together. That requirement simply does not square with the First Amendment.

Second, the Plaintiffs argue that *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-313 (1976) and *Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968) subject laws that burden fundamental constitutional rights based on age-classifications to strict scrutiny. Because the Supreme Court has already recognized that the rights to free exercise of

religion, free speech, freedom of association, and child-rearing are fundamental,[5] Public Act No. 21-6's age-based distinction in the form of the legacy exemption is subject to strict scrutiny, which it fails for the reasons discussed above.

Lastly, the Plaintiffs argue that the right of parents to direct their children's rearing is a fundamental right independent of the Free Exercise Clause. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). Because Public Act No. 21-6 seeks to wrest control of fundamental decisions regarding child rearing away from the Plaintiffs, it is subject to strict scrutiny, which it fails for the reasons discussed above.

## **CONCLUSION**

For the reasons stated herein, the Plaintiffs respectfully ask the Court to deny the Defendants' motion to dismiss in its entirety.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

---

[5] *Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968); *Murgia*, 427 U.S. at 312 n.3; *Cantwell v. State of Connecticut*, 310 U.S. 296, 307 (1940); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000).

## **CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/